Robert BARNETT, Plaintiff-Appellee,
Cross-Appellant,

v.

The HOUSING AUTHORITY OF the
CITY OF ATLANTA,
Defendant-Appellant,

Mrs. Dorothy L. Kelly, et al., Defendants-
Appellants, Cross-Appellees.

No. 82–8166.

United States Court of Appeals,
Eleventh Circuit.

June 27, 1983.

Lenwood A. Jackson, Richard A. Grigsby, D.W. Latimore, Jr., Atlanta, Ga., for defendant-appellant.

Frank J. Beltran, John F. Pendergast, Jr., Atlanta, Ga., for Barnett.

Before KRAVITCH, HENDERSON and ANDERSON, Circuit Judges.

ALBERT J. HENDERSON, Circuit Judge:

The appellee and cross-appellant, Robert Barnett, brought this action under 42 U.S.C. § 1983 against his former employer the Atlanta Housing Authority (AHA or Authority) and three officials of that agency, Dorothy Kelly, Samuel Friedman and Tyrone Hinton. Barnett, who was dismissed from his position as Director of the Redevelopment Division of the Authority, alleged that the defendants deprived him of due process by discharging him without cause and without a post-termination hearing. During the trial, the district court directed a verdict exonerating the three officials from liability in their individual capacities. After the jury answered eleven special interrogatories in favor of the plaintiff, the trial court entered a judgment awarding Barnett $75,000.00 in compensatory relief and $100,000.00 in punitive damages. AHA appeals that judgment, and the plaintiff cross-appeals the directed verdict for the individual defendants.

I.

*The Controversy*

The events that precipitated the present action began in the spring of 1980. At that time, Barnett had been employed in various positions at AHA for approximately fourteen years. In preparation for the disposition of a tract of land, commonly referred to as Vine City, AHA began evaluating the bids submitted by various developers interested in the project. The Board of Commissioners of AHA (Board), contrary to its usual practice, instructed the Redevelopment Division not to recommend a specific bidder. Instead, Barnett, in his capacity as Director of that Division, formulated a comprehensive set of criteria for ranking the merits of the various plans proposed by the interested developers. Officials of both the

Authority and the city government, including the Executive Director of AHA, Tyrone Hinton, praised the evaluation scheme prepared by Barnett and his staff. The unique approach taken toward this particular project was purportedly a response to the intense community and developer interest in the Vine City selection.

Barnett then presented the results of his staff's evaluation to the Board of Commissioners. Only two voting Commissioners attended that meeting on June 13, 1980. Two weeks later, on June 26, 1980, the Board met to award the Vine City project. With three of the Board's five voting members present, the Board by a 2–0 vote selected Noragem, Inc. as the developer (Kelley, the Chairman of the Board, did not customarily vote except in the event of a tie). The company chosen was ranked fourth out of seven developers according to the criteria applied by the Redevelopment Division.

Almost immediately, controversy erupted over the Board's selection. Those companies passed over in the bidding process questioned the Board's objectivity in choosing Noragem, citing the fact that a former employee of AHA owned a controlling interest in the company. Fulfilling his responsibility, Barnett informed an official with the city government of the Board's selection. That official warned Barnett that the city would require an extensive justification of the choice, because the company had been rated less desirable than three other bidders. Barnett then met with his staff to consider their course of action, since they felt that Noragem was unqualified to undertake the project and that the company's proposal was deficient in several respects. According to Barnett, he and his staff were concerned that the Board did not understand the inadequacy of the Noragem bid, especially since most of the Commissioners had not attended the meeting at

which the redevelopment staff explained their evaluation. Believing it to be their obligation to alert the Board to the grounds for criticism of the selection, they prepared a memorandum detailing the problems with the accepted plan. Under Barnett's direction, the memorandum was mailed to the Commissioners and a copy was hand-delivered to Hinton on June 27, 1980.

That same afternoon, a member of the press questioned Barnett about the selection of Noragem. He revealed little information, but did say that the company had not received the staff's highest ranking and referred him to the official evaluation, a matter of public record. Apparently, another staff member divulged the complete details of the memorandum and its delivery to the Board. In any event, within the next two days, articles appeared in the local newspapers revealing in some detail the Redevelopment Division's disagreement with the choice of Noragem and disclosing the fact that a memorandum expressing that view had been forwarded to the Commissioners. Needless to say, the publicity fueled the charges that the Board had awarded the Vine City bid on less than an objective basis.[1]

### THE DISMISSAL

Two days after sending the memorandum, Barnett left for Washington, D.C. on a previously scheduled business trip. Hinton called him back to Atlanta on the next day. Upon his arrival, Barnett met with Hinton and members of the Redevelopment staff on the afternoon of July 1, 1980. At that meeting, the increasing public attention surrounding the Vine City decision was discussed. A staff person admitted that he had probably talked too freely with the press. Hinton then suggested that they develop a strategy for insuring the execution of the project despite the Board's controversial selection. At no time during the

---

1. The controversy did not abate for some time. In the following months, the Mayor of Atlanta vetoed the City Council's approval of AHA's selection on two occasions. As reason for his action, the Mayor cited AHA's complete failure to justify its choice of a developer deemed less acceptable than three other bidders. Additionally, during this period, new charges of a conflict of interest—this time involving a member of the City Council—heightened the continuing negative publicity over the original designation of Noragem.

conference did Hinton express any disapproval of the memorandum or indicate that Barnett's job was in jeopardy. Nevertheless, very early the next morning, Hinton called Barnett at home and requested his immediate presence at the office. Sensing something amiss, he called a member of the law firm that represented AHA who informed him of his impending dismissal. In their meeting, Hinton gave Barnett the option of resigning or facing termination at 4:00 that afternoon. The claimed reason for the discharge was an alleged "irreparable breach" between Barnett and the Board caused by the memorandum. Barnett refused to resign, at least until he was afforded a detailed statement of the reasons for the decision.

Two days later, Barnett received a notice of his termination in a letter from Hinton. The letter stated that the Board had accepted Hinton's recommendation to dismiss Barnett in a meeting held on June 30, 1980, the day before the conference at which Hinton had given no indication of his displeasure with Barnett's performance. In the letter, the Executive Director identified two reasons for the discharge: (1) insubordination in sending the memorandum directly to the Board without Hinton's prior approval, and (2) a lack of confidence in Barnett's judgment that had purportedly developed over a period of time. The notice suspended him from his duties and stated that the termination would become effective in two weeks. Finally, the letter reminded him of his rights under AHA's Personnel Policy[2] to appeal the decision and to be represented by an attorney.

## THE ADMINISTRATIVE APPEAL

Barnett immediately hired an attorney and pursued his remedies outlined in the Personnel Policy. He initiated the administrative appeals process by filing within five days a written request to meet with his immediate supervisor. Hinton held the required meeting on July 28, 1980, a date later than that prescribed by the policy.

During that conference, which was attended by attorneys for both parties, Barnett disputed the Executive Director's alleged reasons for the dismissal. According to the required procedures, Hinton had three working days in which to respond to Barnett's charges. Barnett acquiesced in an extension of that deadline giving the Authority until August 4, 1980 to answer. When Hinton failed to respond by the agreed upon date, Barnett began the next step of the process and submitted a written grievance to the Board. A week later, he finally received the response from Hinton. In that letter the Executive Director adhered to his original decision, and established August 14, 1980 as the final termination date (Hinton had earlier extended the original date). Soon afterward, the Board, including both Kelley and Friedman, formally voted to terminate Barnett.

Although the Personnel Policy required a decision from the Board within thirty days of the filing of the grievance, Barnett's attorney was not notified until September 26, 1980 that the Board had selected a hearing officer, a retired law professor. The letter suggested October 27 and 28, 1980 as possible dates for the hearing and recommended that the parties meet with the professor before that time to establish ground rules. Barnett's attorney prepared documents outlining the facts and issues pertinent to the dispute. Upon receiving those materials, the hearing officer contacted the attorney and informed him that he had not been officially retained. Thereafter, Barnett and his attorney learned that AHA's counsel had been waiting for confirmation from them after the previous letter before formalizing the hearing dates. Irritated by the further delay, Barnett's attorney requested provisional reinstatement pending the completion of the hearing process. AHA refused.

In mid-November, Barnett's counsel notified AHA of his intent to file a lawsuit on behalf of his client if a hearing was not arranged to resolve the conflict. Attorneys

---

**2.** The Personnel Policy is a comprehensive collection of regulations, promulgated by AHA, which sets forth the terms, conditions and procedures governing employment with AHA.

representing AHA responded with the suggestion that the proceedings be held on December 17, 1980. A week before that date, representatives of all parties met with the professor to establish the procedures for the upcoming hearing. Then, the professor became ill and was unable to conduct the inquiry as scheduled. Barnett's attorney obtained the hearing officer's commitment to reschedule the hearing for a day later in the same week, contingent upon his recovery. However, the attorneys for AHA objected that, due to their prior obligations, the hearing would have to be postponed at least until after December 29, 1980. At the same time, AHA did not make any attempt to arrange another date. Frustrated by the prolonged delay, Barnett filed this suit against AHA, Kelley, Friedman and Hinton.[3]

### THE TRIAL

The subsequent trial focused on the plaintiff's claim that AHA's actions deprived him of both substantive and procedural due process, in violation of § 1983.[4] The defendants centered their defense on the fact that Barnett "abandoned" the hearing process to institute the lawsuit. In their view, his resort to a judicial forum waived his right, if any, to due process. The individual defendants also relied on a claim of qualified immunity.

Faced with these competing claims, and the parties' tendency to concentrate on irrelevant matters, the district court made a concerted attempt to keep the trial focused on the pertinent issues. To that end, the judge made a series of rulings at the close of the plaintiff's case. He directed a verdict for the individual defendants, on the grounds that the plaintiff had submitted no evidence piercing their qualified immunity. With AHA remaining as the sole defendant, the court directed a verdict in favor of the plaintiff on two critical issues: the existence of a constitutionally protected property right and the failure of AHA to provide procedural due process. At that time, the court intimated its intention to submit to the jury only the questions of damages and the alleged substantive due process violation.

The following day AHA presented its evidence. Thereafter, the district court vacated all of its rulings made on the previous day. The court announced its willingness to submit to the jury any special interrogatories proposed by the parties.[5] From the jury's responses, the court planned to fashion a judgment. Pursuant to this invitation, the parties submitted a total of eleven interrogatories. After its deliberations, the jury returned findings in favor of the plaintiff on each question.[6]

3. Barnett has never explained why he named only two of the commissioners, Kelley and Friedman, as individual defendants. Nevertheless, the evidence suggests that they may have played a more significant role in the termination. Kelley admitted that she met with Friedman and Hinton to discuss the proposed discharge prior to the Executive Director's meeting with Barnett. There was even a suggestion that Friedman and Kelley may have demanded the firing themselves; in any event, Friedman admitted ordering Hinton to make the termination "stick." As a possible motive for their actions, the testimony revealed that Kelley was extremely embarrassed and angered over the public furor surrounding the selection of Noragem and that she blamed Barnett for the fact that a member of his staff had talked to the press, whereas Friedman bore a longstanding personal grudge against Barnett.

4. The district court directed a verdict for all of the defendants on the remaining claims in the

plaintiff's original complaint. Barnett does not challenge those rulings in his cross-appeal.

5. It is unclear from the record whether the district court also intended to vacate the directed verdict in favor of the individual defendants. However, the judge's subsequent actions in submitting to the jury only the claims against AHA and the eventual entry of a judgment solely against AHA establish his intent to adhere to that ruling.

6. INTERROGATORY VERDICT

1. Was the plaintiff ROBERT BARNETT terminated for serious disorderly conduct involving a major infraction of Authority rules and policies?
No.
2. Was the plaintiff ROBERT BARNETT a permanent employee?
Yes.
3. Do the entire Personnel Policies of the ATLANTA HOUSING AUTHORITY apply to a Division Director who is a permanent employee?

AHA subsequently moved for a judgment notwithstanding the verdict or for a new trial. In a summary order, the district court denied the motion and entered a judgment for the full amount of damages in accordance with the jury's responses to the special interrogatories. AHA now appeals every aspect of the judgment and Barnett cross-appeals the directed verdict in favor of the individual defendants.

## II.

■ As a threshold matter, AHA urges that the fundamental premise of Barnett's constitutional claims—the existence of a property right in his employment—is lacking. In *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580 (1972), the Supreme Court stated that a "person's interest in a benefit" is a constitutionally protectable property interest if there are "rules or mutually explicit understandings that support his claim of entitlement." *See also Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684, 690 (1976); *White v. Mississippi State Oil and Gas Board,* 650 F.2d 540, 541 (5th Cir. 1981).[7] State law determines the legitimacy of a claim of entitlement to continued employment. *Bishop,* 426 U.S. at 344, 96 S.Ct. at 2077, 48 L.Ed.2d at 690; *see also Hearn v. City of Gainesville,* 688 F.2d 1328, 1332 (11th Cir.1982).

■ Under Georgia law, a property interest arises whenever the public employee can be terminated only for cause. *Brownlee v. Williams,* 233 Ga. 548, 551, 212 S.E.2d 359, 362 (1975); *see also Ogletree v. Chester,* 682 F.2d 1366, 1370 (11th Cir.1982); *Glenn v. Newman,* 614 F.2d 467, 471 (5th Cir.1980). In this case, AHA's Personnel Policy[8] permitted the involuntary discharge of Barnett, in the absence of a general reduction in the work force, only "for cause." The regulations listed two general

Yes.
4. If the answer to special interrogatory number 1 was no, what amount of compensatory damages did ROBERT BARNETT suffer as a result of such termination?
$34,000.00.
5. Is Plaintiff ROBERT BARNETT entitled to punitive damages?
Yes.
   If yes, what amount?
$50,000.00.
6. Was there a waiver by the defendants to rely upon the grievance procedures of Section 7.4 of the Personnel Policy?
Yes.
7. If the answer to special interrogatory number 6 is yes, what amount of compensatory damages did ROBERT BARNETT suffer as a result of such improper termination?
$41,000.00.
8. If the answer to special interrogatory number six is yes, is plaintiff ROBERT BARNETT entitled to punitive damages?
Yes.
   If yes, what amount?
$50,000.00.
9. Do you find from a preponderance of the evidence that the plaintiff ROBERT BARNETT waived any right he had to a post termination hearing after the hearing before the Special Master scheduled for December 17, 1980, was cancelled because of the illness of the Special Master.
No.
10. Do you find from a preponderance of the evidence that the sum total of plaintiff's conduct as director of the Redevelopment Division was a sufficient basis for the Executive Director's lack of confidence in him and the conclusion that he was no longer able to effectively manage the affairs of the Redevelopment Division?
No.
11. Do you find from a preponderance of the evidence that conduct of the plaintiff in his capacity as Director of Redevelopment amounted to insubordination and therefore constituted serious disorderly conduct involving a major infraction of the Authority's rules and policies as provided in Defendant's Personnel Policy No. 6.3?
No.

7. This court has adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*).

8. We note that the Personnel Policy at issue here differs significantly from AHA's former policy, which was held not to create a property interest in *Barlow v. Atlanta Housing Authority,* 592 F.2d 280 (5th Cir.1979). Unlike the present policy, the previous one did not contain an explicit "for cause" requirement, a detailed list of the grounds for termination, or comprehensive procedures for contesting a personnel decision. *See* Record on Appeal, Vol. 6, pp. 480–88.

categories of "for cause termination," non-performance and disciplinary infractions. Those disciplinary reasons warranting dismissal were further refined to include repeat offenses involving major violations of the rules, the commission of habitual minor infractions, and "serious disorderly conduct involving a major infraction of Authority rules and policies." To illustrate, the regulations specified twenty-five examples of conduct deemed unacceptable by the Authority. Finally, the policy mandated extensive review procedures which allowed an employee to challenge the termination decision. We conclude that, by limiting the power of the appointing body to dismiss an employee, these regulations confer on Barnett a valid property interest in continued employment.[9] *See Brownlee,* 233 Ga. at 551, 212 S.E.2d at 362; *cf. Glenn,* 614 F.2d at 471–72 (similar internal personnel regulations held to create a legitimate entitlement under Georgia law).

### III.

Having found that Barnett possessed a protected property interest, we turn now to the constitutional violations at issue. As the district court observed, the plaintiff's case essentially alleged deprivations of both substantive and procedural due process. In their responses to the interrogatories, the jurors made findings that established an infringement on both fronts. On appeal, AHA makes several attacks on those findings.

This court has recognized that the "deprivation of a property interest for an improper motive and by means that [are] pretextual, arbitrary and capricious" constitutes a substantive due process violation. *Hearn,* 688 F.2d at 1332; *see also Roane v. Callisburg,* 511 F.2d 633, 639 (5th Cir.1975). During the trial, Barnett introduced sub-stantial evidence indicating that the stated causes for his dismissal, insubordination and his superiors' lack of confidence, were merely "pretextual." He urged that the Board members and the Executive Director did not actually consider his conduct impertinent nor had they developed any lack of confidence in his performance or judgment. Rather, he maintained, and the evidence indicated, that the Board members were angered over the public furor caused by the selection of Noragem, Inc. and attempted to make him a sort of scapegoat for the mounting public pressure. To that effect, several witnesses acknowledged that Barnett customarily communicated directly with the Board and that such direct contact was even encouraged by the officials themselves. Moreover, several witnesses testified to the outstanding job performance of the plaintiff as well as his superiors' confidence in his work. In short, Barnett offered sufficient proof to refute AHA's claim of insubordination and a lack of confidence in his judgment. At a minimum, the evidence was of "such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *See Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (*en banc*); *see also Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1371 (Former Fifth Cir.1982) (*en banc*).

Nonetheless, AHA insists that, by submitting the substantive due process question to the jury, the district court impermissibly invaded the agency's discretion to interpret its own regulations, which set forth the reasons for termination. *See Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214, 227 (1975). This argument overlooks the nature of the constitutional violation in controversy. The thrust of the plaintiff's contention was not that AHA incorrectly construed the personnel

---

9. AHA's contention that Barnett could be terminated "at will" is groundless. As the Georgia Supreme Court has noted, a requirement of "cause" for dismissal constitutes a "limitation on the power of the appointing authority." *Brownlee,* 233 Ga. at 551, 212 S.E.2d at 362. Contrary to AHA's assertion, other provisions of the Personnel Policy do not contradict that limitation. Rather than grant the Executive Director and the Board the unqualified power to discharge an employee at will, the sections relied upon merely designate those officials as the persons charged with making the termination decisions. The provisions do not purport to establish the criteria for making such a determination.

policy's definition of "just cause," but that its actual motive differed from its stated reasons. *Cf. Hearn,* 688 F.2d at 1332; *Roane,* 511 F.2d at 639. The jury agreed [10] and, as previously noted, the evidence sufficiently supported that verdict. Thus, we affirm the finding of a substantive due process violation.

██ The evidence likewise supported the finding of a denial of procedural due process. In this regard, AHA urges that Barnett waived his right to a post-termination hearing by eventually discontinuing his attempt to schedule a hearing date.[11] The former Fifth Circuit Court of Appeals has acknowledged that a public employee may waive his right to procedural due process. *See Downing v. Williams,* 624 F.2d 612, 630 (5th Cir.1980) (Ainsworth, J., dissenting), *adopted as majority opinion on reh'g,* 645 F.2d 1226 (5th Cir.1981). But here, unlike the employee in *Downing,* Barnett did not categorically refuse "to take advantage of the procedures made available to him." *See* 624 F.2d at 630. To the contrary, he persistently endeavored to secure a meaningful opportunity to resist his discharge in accordance with the manner prescribed by AHA's Personnel Policy. While the evidence indicated that at least one postponement of the hearing was unavoidable, the testimony also suggested that the Authority was deliberately dilatory in scheduling the adjudication. At the time Barnett filed the present suit, over six months had elapsed since the date of the original termination, and five months had passed since the effective date of discharge. Under those circumstances, there was an ample basis for the jury to conclude that Barnett did not voluntarily waive his right to a post-termination hearing.[12]

## IV.

██ In addition to challenging the findings of liability, AHA alleges several errors pertaining to damages. The jury, in its initial answers to the special interrogatories, indicated that Barnett was entitled to $34,000.00 in compensatory damages and $50,000.00 in punitive damages for the substantive due process violation. Similarly, the jury appeared to award $41,000.00 in compensatory damages and $50,000.00 in punitive damages for the denial of procedural due process. Fearful that this might be construed as a double recovery for compensatory damages, the district court, with the consent of both parties, polled the jury. During the interrogation by the court the jury explained that it intended the $34,-000.00 to reimburse the plaintiff for his lost wages, whereas the $41,000.00 compensated him for his emotional distress. The jury further articulated that it meant to award Barnett an aggregate amount of $100,-000.00 in punitive damages. On appeal, AHA attacks each component of the jury award.

First, AHA claims that the evidence did not justify the award for back pay. We disagree. The $34,000.00 equals the precise amount of wages lost between the time of the termination and the date of the trial.[13]

---

10. *See* Special Interrogatory No. 1, and the jury's response thereto, *supra* note 3.

11. The parties do not dispute the fact that the July 28, 1980 meeting with Hinton satisfied Barnett's right to an abbreviated pretermination "hearing." *See Glenn,* 614 F.2d at 472; *see also Thurston v. Dekle,* 531 F.2d 1264, 1273 (5th Cir.1976) ("Where a governmental employer chooses to postpone the opportunity of a nonprobationary employee to secure a full-evidentiary hearing until after dismissal, risk reducing procedures must be accorded. These must include, prior to termination, written notice of the reasons for termination and an effective opportunity to rebut those reasons."), *vacated on other grounds,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978).

12. In a related matter, AHA claims that Barnett is precluded from bringing a § 1983 action because he failed to exhaust administrative remedies. The Supreme Court, however, has rejected any exhaustion requirement in this context. *See Patsy v. Board of Regents of the State of Florida,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

13. Because this case involves both a procedural and a substantive due process violation, it does not implicate the usual rule precluding an award of back pay solely for a denial of procedural due process. *See generally Wilson v. Taylor,* 658 F.2d 1021, 1033–35 (5th Cir.1981). Moreover, AHA does not controvert the appropriateness of this element of damages; rather, it limits its challenge to the amount.

This computation was based on the evidence establishing the period Barnett remained unemployed and the difference between his salary with AHA and the compensation he received from later employment. On the other hand, the defendant proffered no testimony or documentary proof to refute the plaintiff's evidence. In short, the evidence fully sustained the jury award.[14]

AHA next disputes Barnett's entitlement to compensation for his emotional distress.[15] Contrary to the Authority's contention, the $41,000.00 award does not contravene the limitation imposed on such recovery by the Supreme Court in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). There, the Supreme Court held that emotional distress is compensable in a § 1983 action, but that if the deprivation is justified, the recovery is limited to the distress actually attributable to the "denial of procedural due process itself." 435 U.S. at 263, 98 S.Ct. at 1052, 55 L.Ed.2d at 264–65. In contrast, the jury in this case found that the discharge was without justification. Thus, Barnett was entitled to compensation for the mental anguish caused by both the substantive and procedural due process violations. *Cf. Baskin v. Parker,* 602 F.2d 1205, 1210 (5th Cir.1979).

In its final assault on the damage feature, AHA excepts to the jury's assessment of punitive damages in the amount of $100,000.00. The Authority advances two reasons to overturn that portion of the verdict. First, it claims that the evidence adduced at the trial did not warrant an award of any punitive damages. We find there was sufficient evidence to authorize the jury's consideration of punitive damages. In a recent case, the Supreme Court clarified the appro-

priate legal standard that will justify such an award. *Smith v. Wade,* —— U.S. ——, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). There, the Court held that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." —— U.S. at ——, 103 S.Ct. at 1640, 75 L.Ed.2d at 651. The district court's pertinent instruction in this case echoed that standard.[16]

Barnett produced ample proof that his former employer acted at least with "reckless indifference" in denying him substantive and procedural due process. As earlier noted, the evidence sustained the jury's finding that AHA officials manufactured pretextual reasons for the discharge, that the termination was not "for cause." Given Barnett's constitutionally protected property interest in his employment, such a blatant disregard of the proper grounds for discharge certainly suggests a "callous indifference" to the plaintiff's rights. Moreover, the Authority's failure to arrange a prompt post-termination hearing, and the indications that the prolonged delay may have been intentional, creates the same inference of AHA's attitude toward Barnett's procedural due process rights. In short, the evidence was of "such quality and weight" as to justify the submission of the appropriateness of punitive damages to the jury. *See Boeing,* 411 F.2d at 374.

Alternatively, AHA urges that under *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), punitive damages in § 1983 suits may not be levied because it is a public

---

14. In a related contention, AHA argues that the $34,000.00 and the $41,000.00 represented double recovery for a single item of damages. This claim is patently frivolous, however, in view of the jury's explicit rejection of that interpretation made in response to the district court's questions.

15. At the trial, Barnett testified at some length concerning the anxiety and depression, as well as the strain on his marriage, that resulted from the termination and subsequent events.

16. The court charged the jury that punitive damages "may be awarded if and only if the defendants have engaged in a wilful or malicious violation of the plaintiff's constitutional rights or that [sic] there have been intentional acts by the defendant in gross disregard, which means in higher exaggerated disregard of the plaintiff's constitutional rights or a reckless disregard by the defendants of the plaintiff's rights..." Trial Transcript at 803–04.

entity. The Court in *City of Newport* held that municipalities are immune from punitive damages in § 1983 suits. 453 U.S. at 271, 101 S.Ct. at 2762, 69 L.Ed.2d at 635. In reaching that conclusion, the court focused on the purposes of such awards; retribution and deterrence. *Id.* at 266–67, 101 S.Ct. at 2759, 69 L.Ed.2d at 632. According to the Court, permitting punitive awards to be assessed against a local government would not punish the actual wrongdoer, since innocent taxpayers would ultimately bear the financial burden. *Id.* at 267, 101 S.Ct. at 2760, 69 L.Ed.2d at 632. Similarly, the Court noted that the deterrence rationale largely fails in this context, because to be effective, deterrence should be aimed at the individual actors responsible for the constitutional violation, rather than against a governmental entity which must pass the cost onto the citizenry. *Id.* at 270, 101 S.Ct. at 2761, 69 L.Ed.2d at 634.

■ We decline AHA's invitation to consider whether those same policies exempt the Authority from liability for punitive damages. The defendant waived its right to object on this ground to any award of punitive damages levied against it. Fed.R. Civ.P. 51 mandates that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." While Rule 51 imposes this procedural requirement in "uncompromising language," *see City of Newport,* 453 U.S. at 255, 101 S.Ct. at 2753, 69 L.Ed.2d at 624, it is not without exceptions. However, we will generally depart from the rule only in narrow circumstances; for example, " 'an appellate court will notice error so fundamental as to result in a miscarriage of justice,' but 'that power will only be exercised in exceptional cases.' " *Patton v. Archer,* 590 F.2d 1319, 1322 (5th Cir.1979), quoting, *Delancey v. Motichek Towing Service, Inc.,* 427 F.2d 897, 901 (5th Cir.1970).

Although the Supreme Court excused a similar procedural default in *City of Newport,* we are not persuaded that the same result should obtain in this case. *Cf. Black v. Stephens,* 662 F.2d 181, 184 n. 4 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). In *City of Newport,* the defendant municipality raised for the first time its objection to the assessment of punitive damages on a motion for a new trial. 453 U.S. at 253, 101 S.Ct. at 2752–53, 69 L.Ed.2d at 623. The district court in that instance recognized that the city had failed to make a timely objection to the relevant instruction. *Id.* at 255 n. 11, 101 S.Ct. at 2754 n. 11, 69 L.Ed.2d at 625 n. 11. Nevertheless, the trial judge considered the challenge and ruled against the city on the merits. *Id.* at 255–56, 101 S.Ct. at 2754, 69 L.Ed.2d at 624–25. Confronted with that procedural posture, the Supreme Court likewise addressed the merits of the claim, stressing the novel and important nature of the question, the fact that the district court itself had excused the procedural default, and the fact that the question had been "squarely presented and decided on a complete trial record" by the district court. *Id.* at 257, 101 S.Ct. at 2754, 69 L.Ed.2d at 625–26.

By contrast, the district court here did not reach the merits of the issue. AHA advanced the argument for the first time in a motion for judgment notwithstanding the verdict and for a new trial. In his responsive brief, Barnett countered by claiming that Rule 51 barred the belated objection.[17] Faced with those conflicting positions, the district court summarily denied the defendant's motions. Thus, the record offers no indication that the trial court ever considered the merits of AHA's contention or excused the procedural default.

Moreover, unlike in *City of Newport,* AHA's tardy mention of this ground result-

17. AHA did object to the district court's punitive damages instruction on the ground that the evidence was insufficient to sustain such an award. However, that argument did not preserve the wholly different contention that AHA,

as a public entity, is immune to liability for punitive damages under *City of Newport. Cf. Harris v. Chanclor,* 537 F.2d 203, 206 (5th Cir. 1976); *Black,* 662 F.2d at 184 n. 4.

ed in an inadequate trial record. As previously noted, a major factor in the Supreme Court's decision to immunize municipalities from liability for punitive damages was the taxpayers' ultimate accountability for those awards. 453 U.S. at 267, 101 S.Ct. at 2760, 69 L.Ed.2d at 632. While we recognize the quasi-municipal nature of the Authority, the present record contains no evidence of the source of the funds from which a judgment will be paid. A brief review of Georgia law suggests that AHA may finance its work through a variety of sources, including the issuance of bonds. *See, e.g.,* Ga. Code § 99–1121. At the same time, the Georgia Code specifies that the Housing Authority's financial obligations shall not become the debt of any political subdivision. *See* Ga.Code § 99–1122. With this limited knowledge, we cannot make a principled determination whether the rationale of *City of Newport* confers the same immunity on an entity such as AHA.

In sum, AHA's failure to timely object to the submission of the punitive damages question to the jury constitutes a procedural default under Rule 51.[18] This omission has resulted in a record wholly inadequate to permit this court to decide the merits of the claim. We therefore conclude that because of the defendant's waiver, *City of Newport* "can have no impact on the award of punitive damages" against AHA.[19] *See Black,* 662 F.2d at 184 n. 4.

**18.** In addition, we do not view the charge as plain error. *See Patton,* 590 F.2d at 1321. As the Supreme Court recognized in *City of Newport,* "[a] court's interpretation of the contours of municipal liability under § 1983 ... hardly could give rise to plain judicial error since those contours are currently in a state of evolving definition and uncertainty." 453 U.S. at 256, 101 S.Ct. at 2754, 69 L.Ed.2d at 625; *see also Black,* 662 F.2d at 184 n. 1. Ascertaining whether *City of Newport* applies to an entity such as AHA falls within that same nebulous area of doctrinal development.

**19.** AHA's failure to press this argument in a timely fashion is all the more inexcusable in light of the fact that the Supreme Court handed down *City of Newport* six months *before* the trial in this case.

**20.** We reject Friedman's suggestion that the district court did not reach the question of qualified immunity, but instead, strictly based its ruling on an alleged lack of evidence estab-

## V.

Barnett filed a cross-appeal to the district court's directed verdict in favor of the individual defendants—Kelley, Friedman, and Hinton. The trial judge essentially held that the plaintiff had not carried his burden of proof in piercing the officials' qualified immunity.[20] More specifically, the court decided that the plaintiff had failed to establish that those defendants knew "they were violating a known constitutional right or recklessly did so."[21] Trial Transcript at 671. On appeal, Barnett maintains that the district court's decision was erroneous. We agree.

■ A good faith defense is generally available to officials sued in their individual capacities for damages under § 1983. *See, e.g., Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Williams v. Bennett,* 689 F.2d 1370, 1385 (11th Cir. 1982). In the past, a claimant could successfully rebut that affirmative defense by showing either (1) that the individual's actions were motivated by malicious intent (the "subjective component"), or (2) that the defendant knew or should have known that he was violating a clearly established constitutional right ("objective component"). *See Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396,

lishing liability. While the district court did decide that the plaintiff had not made a *prima facie* showing of a conspiracy among the officials, Count III of the original complaint also alleged that the defendants were liable for "otherwise participating" in the denial of Barnett's constitutional rights. Record on Appeal at 20. The district court, in a separate ruling, expressly quoted the legal standard for qualified immunity and absolved the defendants of "individual liability." Trial Transcript at 671.

**21.** The district court did not offer any further explanation for its conclusion. We note, however, that this determination appears to be inconsistent with the court's implicit finding that the evidence sustained an award of punitive damages. *Cf. City of Newport,* 453 U.S. at 267, 101 S.Ct. at 2760, 69 L.Ed.2d at 632 ("a municipality ... can have no malice independent of the malice of its officials.").

408–09 (1982); *see generally Barker v. Norman,* 651 F.2d 1107, 1121–22 (5th Cir.1981). Recently, however, the Supreme Court simplified the nature of the inquiry, holding that the objective criteria alone governs the applicability of the defense. *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739, 73 L.Ed.2d at 410; *see also Williams,* 689 F.2d at 1385. In light of that development, as well as the district court's sole focus on the objective component of qualified immunity, we turn to an examination of *Harlow.*

There, the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. In discarding the former alternative focus on the actor's state of mind, the Court noted that this subjective criteria usually enabled plaintiffs bringing even "insubstantial claims" to overcome a motion for summary judgment. 457 U.S. at 816, 102 S.Ct. at 2737, 73 L.Ed.2d at 409; *see also Barker,* 651 F.2d at 1127. Thus, the Court limited the relevant concern to objective indicia of the official's good faith and prescribed the manner in which that criteria should be applied in order to permit the early resolution of frivolous claims. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738–39, 73 L.Ed.2d at 410–11. According to the Court,

> [o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his

conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Id.* at 818, 102 S.Ct. at 2739, 73 L.Ed.2d at 410–11 (footnote omitted); *cf. Barker,* 651 F.2d at 1126.

■ Hence, in assessing the validity of the district court's directed verdict, *Harlow* directs our attention to the constitutional violation at issue. In this instance, the law manifesting the unconstitutional nature of the individual defendants' alleged conduct could not be more clearly established. Barnett's § 1983 suit does not pertain to a novel theory of constitutional entitlement. Instead, it hinges on his fundamental right not to be deprived of a property interest without due process of law. For years, the federal courts have consistently recognized that state law determines whether a public employee has a constitutionally protected property right to continued employment. *E.g., Bishop v. Wood,* 426 U.S. at 344, 96 S.Ct. at 2077, 48 L.Ed.2d at 690. Equally undisputable is the fact that Georgia recognizes a property interest in public employment if the employee can be terminated only "for cause." *E.g., Brownlee v. Williams,* 233 Ga. at 551, 212 S.E.2d at 362. Finally, AHA's Personnel Policy explicitly required "cause" as a basis for termination. In summary, the constitutional violation alleged by the plaintiff is, and has been, firmly and unambiguously recognized by existing law. *Cf. Williams,* 689 F.2d at 1386; *Crowder v. Lash,* 687 F.2d 996, 1007 (7th Cir.1982).

Under *Harlow,* "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." 457 U.S. at 818, 102 S.Ct. at 2739, 73 L.Ed.2d at 411. For that reason, the directed verdict in favor of the individual defendants was erroneously granted, since the plaintiff alleged a violation of clearly established law and the de-

fendants, as "reasonably competent" officials, should have been familiar with the law governing their conduct. Nevertheless, this conclusion does not automatically establish their liability. The Supreme Court suggests that, even if the law is settled, a public official might still claim "extraordinary circumstances" and demonstrate that "he neither knew nor should have known of the relevant legal standard." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739, 73 L.Ed.2d at 411. If Kelley, Friedman and Hinton should successfully show such circumstances, they may still be entitled to immunity. *See Crowder,* 687 F.2d at 1007; *Trejo v. Perez,* 693 F.2d 482, 485 (5th Cir.1982). Additionally, even if the defense fails, the plaintiff still has the burden of proving that the individual defendants engaged in conduct violative of his constitutional rights. This question is, of course, distinct from the issue of qualified immunity. *Barker,* 651 F.2d at 1123. We leave the initial resolution of these issues to the district court.

## VI.

In summary, after careful consideration of the numerous arguments of the parties,[22] we affirm the judgment against AHA and reverse the directed verdict in favor of the individual defendants.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

22. In addition to the points addressed in this opinion, AHA raises several minor contentions which are likewise without merit.