888 F.2d 1356
 Violeta ADAMS, Plaintiff-Appellant,
v.
BAINBRIDGE-DECATUR COUNTY HOSPITAL AUTHORITY and its
Members, Hubert Parker, W.T. Laslie, Graham Bolton, Woodrow
Long, Gerald Woodward, Glennie Rozier, Henry Metcalf,
individually and in their official capacities; Memorial
Hospital and Manor; and Raymond Wright, individually and in
his capacity as Executive Director of Memorial Hospital and
Manor, Defendants-Appellees.
 No. 88-8944.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 24, 1989.
 
 Ira P. Bernstein, Marc H. Salm, Mack & Bernstein, Atlanta, Ga., for plaintiff-appellant.
 Ralph C. Smith, Jr., Smith, Perry & Epps, Bainbridge, Ga., William H. Norwood, Alexander & Varn, Thomasville, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Georgia.
 Before FAY and HATCHETT, Circuit Judges, and ALLGOOD*, Senior District Judge.
 FAY, Circuit Judge:
 
 
 1
 This case requires determination of whether or not plaintiff-appellant Violeta Adams, who was discharged, had a property interest in her job as Director of Human Resources at Memorial Hospital and Manor (Memorial), a defendant-appellee, in Bainbridge, Georgia. By granting a directed-verdict motion of defendants-appellees, the trial judge found that Adams did not have a property interest in her continued employment in this position at Memorial. Following a jury verdict in favor of defendants-appellees as to the other claims raised, Adams' sole issue on appeal is the propriety of the district judge's directing the verdict. After a thorough review of the testimony and evidence presented at trial, we affirm.
 
 I. BACKGROUND
 A. Statement of Facts
 
 2
 Defendant-appellee Memorial is comprised of a hospital and adjoining nursing home, which are administered by defendant-appellee Bainbridge-Decatur County Hospital Authority (Hospital Authority). Plaintiff-appellant Adams has been employed by Memorial twice. From October, 1975 until September, 1976, she worked there as a part-time nurse. She left for a higher-paying job in a state hospital.[1]
 
 
 3
 In 1977, Adams was hired by the nursing department of Memorial as a full-time nurse. Shortly thereafter, Adams, who is a licensed, registered nurse and has a master's degree in nursing education, was promoted to the administrative position of In-Service Director. In this job, she conducted courses in intensive care, neonatal care, and infection control for the medical community; coordinated community activities, such as a blood-pressure clinic; served on the hospital and nursing home infection-control committee; oriented new employees; and assisted in Memorial accreditation, licensure and quality assurance.
 
 
 4
 Defendant-appellee Raymond Wright became Executive Director at Memorial in September, 1977, following his appointment by the Hospital Authority. Employed by a definite, written contract pursuant to the Hospital Authority bylaws, Wright directs the daily activities and policies of Memorial; supervises the department heads, who have delegated authority, including hiring and firing, for their respective departments; and retains ultimate authority for termination of employees. The Hospital Authority bylaws provide that Wright may be removed as Executive Director only for cause after a hearing and vote by the Hospital Authority membership.
 
 
 5
 In April, 1978, Wright made Adams Director of Continuing Education and Training. Her duties included orientation for new employees, in-service education for the nursing department and for other departments in management, fire and safety, and other duties assigned periodically. Adams also retained some of her previous responsibilities, such as hospital accreditation, quality assurance and community education. Her hourly wage increased as Director of Continuing Education and Training.
 
 
 6
 In a May 20, 1983 memorandum to all employees, Wright announced the creation of a human resources department, which encompassed continuing education, employee relations, public relations and publications. He advanced Adams to Director of Human Resources in charge of this new department and stated that she also would handle other special projects. In addition to Adams' former education, infection control, quality assurance, accreditation and licensure responsibilities, her promotion included the duties of custody and maintenance of the personnel files as well as public relations and patient education. As Director of Human Resources, Adams had assistance from department personnel, whom she supervised.
 
 
 7
 Since Adams assumed the job of the former personnel director, her responsibilities also involved recruiting, interviewing and screening job applicants, orienting new employees, preparing the pay-scale system, and ascertaining that department heads followed the proper procedure and documentation in discharging employees. As part of her orientation of new employees, Adams reviewed the Memorial Hospital and Manor Personnel Policy Handbook (Personnel Policy Handbook). The Personnel Policy Handbook, approved by the Hospital Authority in 1979, was effective while Adams was Director of Human Resources.
 
 
 8
 Relevant to this case is the grievance procedure outlined in the Personnel Policy Handbook. A dissatisfied employee has a three-step procedure of expressing a grievance to the immediate supervisor, first; to the responsible department head, second; and to the Executive Director, third.[2] Depending on an employee's position, steps can be eliminated. For example, Adams, as a department head, would register her grievances directly with the Executive Director.
 
 
 9
 In 1983, Wright assigned Adams the project of revising the disciplinary procedures at Memorial. She formulated proposed disciplinary procedures on the concept of progressive discipline, essentially consisting of an oral warning, a written reprimand, probation, suspension and discharge. Adams and her assistants spent approximately a year collecting disciplinary procedures from various hospitals and submitting drafts and revisions to the department heads for approval.
 
 
 10
 Her last revision, dated July 27, 1984, describes progressive discipline, minor and major violations, involuntary terminations, appeals, criteria for proving just cause, and contains forms for disciplinary use, such as a notice of suspension. The final page of this revision is a receipt statement to be signed by employees signifying that they have read and understood the disciplinary procedures to be used at Memorial. Following distribution of this last revision of disciplinary-action procedures, Adams placed the signed receipts from employees in their personnel files, and she gave the disciplinary-action procedures to new employees during orientation, also obtaining receipt statements from them. Adams considered this latest revision to be the Memorial disciplinary-action manual.
 
 
 11
 Wright, however, testified that the so-called disciplinary-action manual, compiled by Adams, "[a]bsolutely" was not an official document of Memorial since it was "[n]ot even approved at the lowest department head level" because of ambiguities that never were corrected. R3-266. Furthermore, Adams admitted that the disciplinary manual was not formally adopted by the Hospital Authority. R2-190. Wright gave Adams authority for compiling the revisions for Memorial disciplinary action, but not for approval, which was the responsibility of the department heads, the Executive Director and the Hospital Authority. Wright was unaware that Adams had distributed the disciplinary document, that she was using it in orientation, that employees were required to sign a receipt statement, and that the forms were being utilized in disciplining employees. When Wright learned that copies of this document were throughout Memorial, he had them removed.
 
 
 12
 Before Wright became aware of Adams' distribution and use of the final revision of the disciplinary-action procedures for Memorial, he was informed of complaints, regarding Adams' performance as Director of Human Resources, from department heads and the medical staff. Generally, these complaints were that Adams was interfering in the department heads' hiring and firing of their personnel and affecting morale at Memorial.[3] Wright talked with Adams on several occasions concerning complaints that he had received from department heads regarding their difficulty in working with her. Consequently, he did not give her a pay raise in 1984. R3-292.
 
 
 13
 By the summer of 1986, the complaints of Adams' interference with department heads had escalated, and Wright began considering the reorganization of the human resources department. Basically, the complaints to Wright were that Adams was involving herself too much in the selection of prospective employees and in the operation of the various departments rather than acting as a support person.[4] In addition to complaints that Adams was interfering with the selection of nurses in the screening process, Cynthia Vickers, Director of Nursing, brought to Wright's attention two incidents disruptive to the operation of the nursing department.
 
 
 14
 First, during the summer of 1986, Vickers gave some nurses a raise and not others. Vickers reported to Wright that Adams had taken credit for the raises obtained by some nurses and that she had blamed Vickers for the failure of other nurses to receive raises. Wright considered this creation of dissension among the nursing staff sufficient to demonstrate Adams' interference in the operation of the nursing department. R3-299-300. Second, Vickers was coordinating the opening of an intensive care unit and asked Adams for training for the nurses. Because Adams did not schedule this training, the intensive care unit opened in October, 1986, without the requested nurse training. Wright found Adams not only dilatory in arranging training requested by department heads, but also arbitrary in setting priorities. R3-304-05. On September 12, 1986, Vickers submitted her letter of resignation to Wright. In response to Wright's questioning as to the cause for her departure, she explained that she had obtained another job and that her continual problem with Adams' attempting to run her department "was one of the major reasons." R3-387-88. Considering a good director of nurses "the backbone of the hospital," Wright offered Vickers a raise to keep her, but he was unsuccessful. R3-313-14, 349.
 
 
 15
 Wright called a meeting with Adams and Vickers on September 29, 1986. He addressed Vickers' specific complaints and advised Adams that it was her responsibility to support the department heads. On September 30, 1986, after further consideration of Adams' undermining effect at Memorial, Wright relieved her of her position as Director of Human Resources because of her inability to work with the department heads and medical staff, and he requested that she move into another office. Adams was to work on special projects, as she had done from 1983 to 1986, and to report to Wright directly.[5] He informed the Hospital Authority and the department heads that she no longer was the Director of Human Resources. Wright reorganized the human resources department by reassigning Adams' responsibilities to other department heads.
 
 
 16
 Wright did not view his reassignment of Adams as a disciplinary action, but rather an attempt to "salvage" her usefulness to Memorial. R3-332. Her salary and benefits remained the same. Wright as well as members of the medical staff recognized Adams' capabilities in such areas as accreditation and quality assurance, but they were cognizant of her difficulties in working with Memorial personnel.[6]
 
 
 17
 Wright assigned Adams the project of obtaining information on "paid time off," an employee benefit that he wanted to implement at Memorial. R2-107; R3-341-42. She collected this information from various hospitals and presented it to Wright. Also in October, 1986, Wright asked Adams to attend a two-day, personnel seminar in Atlanta. She went to this seminar and reported the acquired information to Wright.
 
 
 18
 In October, 1986, Adams questioned Wright as to her responsibilities at Memorial. On October 7, 1986, Wright presented to Adams for her signature a memorandum, which recounted her interpersonal problems at Memorial and specified that she was relieved of her responsibilities as Director of Human Resources on September 30, 1986.[7] Adams refused to sign the memorandum, which was placed in her personnel file.
 
 
 19
 Adams was so upset by losing her position as Director of Human Resources that she had to take sick leave during October, 1986.[8] On October 29, 1986, Adams wrote Wright a letter demanding reinstatement in her previous position; communication of her reinstatement to Memorial department heads, medical staff and the Hospital Authority; and compensation for emotional and physical distress, resulting from her perceived unjustified demotion. She requested a response by 4:30 P.M., October 30, 1986, and, unless fully reinstated, a hearing before the Hospital Authority in accordance with the Personnel Policy Handbook.
 
 
 20
 Wright responded to Adams in a letter dated October 30, 1986. Therein, he stated that he would not grant her demands, which indicated that she could not continue to work under him as Memorial Executive Director, and that her employment was terminated.[9] He gave her two weeks notice, making her termination effective November 13, 1986, and referred her to Chapters VII and VIII of the Personnel Policy Handbook.[10]
 
 
 21
 Chapter VII of the Personnel Policy Handbook provides in pertinent part the following regarding a personnel decision by the Executive Director:
 
 
 22
 Because the full responsibility for the operation of the institution has been delegated to the Executive Director, any decision rendered in a problem situation by the Executive Director, must be regarded as final and binding; except employees may appeal such a decision, if they wish, by submitting a written request for a review addressed to the Chairman of the Hospital Authority in care of the Hospital.
 
 
 23
 Arrangements for an interview with representatives of the Hospital Authority will be arranged with the employee within 10 days of receipt of the written request for a review.
 
 
 24
 Memorial Hospital and Manor Personnel Policy Handbook, Grievance Procedure, ch. VII, Sec. 7.1. Chapter VIII, concerning termination of employment, states regarding involuntary termination: "Ordinarily, an employee will not be discharged without having previously been made aware of his failure to perform satisfactorily and given the opportunity to improve his performance." Id. at ch. VIII, Sec. 8.2. The listed acts or conditions giving cause for immediate discharge without notice and accrued benefits are inapplicable to Adams.[11]
 
 
 25
 Rather than following the explicit procedure stated in the authorized Personnel Policy Handbook, Adams admitted that she never wrote the Hospital Authority to request a review of Wright's decision regarding her reassignment.[12] R2-166. She also conceded that she has never had a written contract of employment with Memorial and that no one had informed her that she had a specific position for a fixed period of time. R2-188; R3-224. Furthermore, she admitted that she had no expectation that she would remain employed at Memorial and that she was no different from any of the nursing personnel, who were capable of leaving if they so desired or of being terminated by Memorial. R3-224-25. While she was aware of other Memorial personnel having been terminated, Adams conceded that she did not know of any Memorial employee who received a hearing before the Hospital Administration. R3-225, 227-28.
 
 
 26
 Following her termination, Adams' attorneys wrote the chairman of the Hospital Authority on November 3, 1986, and requested a hearing within ten days from receipt of the letter. Adams based this request on the disciplinary manual that she compiled and on the grievance procedure in the Personnel Policy Handbook. R2-146-47. The attorney, representing the Hospital Authority, replied in a letter dated November 5, 1986, that the applicable Personnel Policy Handbook does not provide a hearing for a termination. Furthermore, he advised that Adams' position as Director of Human Resources had been discontinued and that her responsibilities had been assumed by other department heads.[13] Therefore, her former position no longer existed.
 
 B. Procedure in the Trial Court
 
 27
 Alleging violations of the First and Fourteenth Amendments and 42 U.S.C. Secs. 1981 and 1983 by the Hospital Authority, its members, Memorial, and Wright, both individually and in his capacity as Memorial Executive Director, plaintiff-appellant commenced this action in the Middle District of Georgia on December 22, 1986.[14] At the close of plaintiff's case, defendants made five directed-verdict motions, one of which was to direct the verdict as to Adams' lack of a property interest entitling her to continued employment at Memorial.[15] Plaintiff also made a directed-verdict motion that Memorial employees could not be removed except for cause and that Adams was not given a hearing regarding her demotion and termination. The trial judge reserved ruling on these motions, and defendants presented their case.
 
 
 28
 Before closing arguments, however, the judge decided to grant defendants' directed-verdict motion regarding Adams' not possessing a property interest in her continued employment at Memorial. Based upon the testimony, evidence and applicable law, the district judge concluded that Adams did not have a property interest in her continued Memorial employment because she was an at-will employee. All other motions for directed verdict were denied. Following a jury verdict in favor of defendants-appellees, the only issue on appeal is the appropriateness of the trial judge's directing the verdict.[16]
 
 II. ANALYSIS
 A. Standard of Review
 
 29
 The appellate standard of review for a directed verdict in this circuit is sufficiency of the evidence. Finch v. City of Vernon, 877 F.2d 1497, 1501-02 (11th Cir.1989); Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc)[17]; see Fed.R.Civ.P. 50(a). This determination is made by evaluating all of the evidence, together with logical inferences, in the light most favorable to the party opposing the motion. Price v. Lockheed Space Operations Co., 856 F.2d 1503, 1505 (11th Cir.1988); Boeing Co., 411 F.2d at 374.[18] A directed-verdict motion should be granted when "there can be but one reasonable conclusion as to the verdict." Brady v. Southern Ry. Co., 320 U.S. 476, 479-80, 64 S.Ct. 232, 234-35, 88 L.Ed. 239, 243 (1943); Price, 856 F.2d at 1505.
 
 
 30
 B. Determination of a Property Interest in Continued Employment
 
 
 31
 The acquisition of a Fourteenth Amendment property interest with accompanying procedural due process requires more than a unilateral expectation; there must be a legitimate claim of entitlement. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972); see Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580 (1972). "The existence of a legitimate claim of entitlement to a property interest in continued employment is to be determined in accordance with state law." Nicholson v. Gant, 816 F.2d 591, 597 (11th Cir.1987) (per curiam) (citing Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684, 690 (1976)). In Georgia, a property interest in public employment exists whenever a public employee can be terminated only for cause.[19] Crowell v. City of Eastman, 859 F.2d 875, 877 (11th Cir.1988); Barnett v. Housing Auth., 707 F.2d 1571, 1576 (11th Cir.1983); Glenn v. Newman, 614 F.2d 467, 471 (5th Cir.1980); Brownlee v. Williams, 233 Ga. 548, 551-55, 212 S.E.2d 359, 362-64 (1975).
 
 
 32
 An analogous Eleventh Circuit case is dispositive of Adams' employee status and of the result in this case. Wofford v. Glynn Brunswick Memorial Hosp., 864 F.2d 117 (11th Cir.1989) (per curiam).[20] The plaintiffs in Wofford were in-house security guards, employed by the defendant county hospital. After the decision to hire an independent contractor to provide security services, the hospital notified these plaintiffs that they were terminated because their positions had been eliminated. When the Wofford plaintiffs were terminated, the hospital had in effect a personnel-policy manual, which listed classifications of separation, such as discharge, lack of ability and reduction in force. The personnel policy also contained a grievance procedure consisting of five steps, the last of which was requesting action by the hospital administrator if the grievance was not settled by the prior steps.[21] None of the plaintiffs had written employment contracts, and they did not pursue their grievances through the final step provided by the policy.
 
 
 33
 The Wofford plaintiffs claimed that defendants had deprived them of a constitutionally protected property interest without due process of law.[22] Pursuant to O.C.G.A. Sec. 34-7-1, the court found that an indefinite hiring in Georgia may be terminated at will by either party and that an employer is not liable for discharging an at-will employee with or without cause.[23] Wofford, 864 F.2d at 119 (citing Taylor v. Foremost-McKesson, Inc., 656 F.2d 1029, 1031 (5th Cir. Unit B Sept. 1981) (per curiam)). Recognizing that the Georgia Supreme Court has held that a property interest arises when a public employee can be terminated only for cause, the court explained and distinguished cases where for-cause employment had been found.[24]
 
 
 34
 Wofford bolstered its analysis of Georgia law with a recent, Georgia appellate decision, holding that internally administered policies fail to transform an at-will employee into a contract employee and cannot support an action for wrongful discharge. Wofford, 864 F.2d at 119 (citing Garmon v. Health Group of Atlanta, Inc., 183 Ga.App. 587, 359 S.E.2d 450 (1987)). Conceding that she did not have an employment contract with the subject hospital, the Garmon plaintiff contended that the internal policies were applicable and that noncompliance with these policies in her termination constituted wrongful discharge. Unpersuaded by the plaintiff's notice and knowledge of hospital policies and procedures regarding discipline and termination, allegedly not followed in her termination, the Garmon court concluded:
 
 
 35
 The internally administered policies which the nurse seeks to legally enforce go to the essence of the employment relationship and the employer's right in an at-will situation to terminate the employee with or without cause and regardless of motive. To accept her argument for legal enforcement of the subject policies would, for the purpose of her termination, de facto transform her from an at-will employee into one under contract to the hospital, in violation of OCGA Sec. 34-7-1.
 
 
 36
 Garmon, 183 Ga.App. at 589, 359 S.E.2d at 453 (citations omitted). Relying on Garmon, Wofford determined that its plaintiffs were at-will employees who could be terminated with or without cause, absent a discriminatory purpose, because the internal personnel manual of the defendant hospital did not give them legitimate claims of entitlement to continued employment. Wofford, 864 F.2d at 120. Wofford concluded that "in Georgia, an at-will employee typically does not have a reasonable expectation of continued employment sufficient to form a protectable property interest." Id. at 119.[25]
 
 C. Application
 
 37
 Applying the sufficiency-of-the-evidence review standard in this case, we find a complete absence of any evidence that could be used by a jury as the basis for finding that plaintiff-appellant had a property interest in her continued employment as Director of Human Resources at Memorial. Consequently, she was not entitled to procedural due process in her termination. Adams had no contract or agreement with Memorial for any fixed term of employment. As opposed to the delineated, for-cause employment of Wright as Executive Director, Adams admitted that she was subject to termination by Memorial, and described her job as having all the characteristics of at-will employment.
 
 
 38
 In this action, Adams has complained that Wright, who progressed her in responsibilities and pay for nine years at Memorial, violated her property interest in her job as Director of Human Resources and denied her due process in reassigning and terminating her. She admitted that Wright, as Executive Director, had the authority to determine her responsibilities at Memorial. Any Hospital Authority review, which is not defined specifically as a hearing in the Personnel Policy Handbook, was unavailing regarding Adams' reassignment. She failed to follow the official grievance procedure, of which she clearly was aware given her Memorial orientation responsibilities. This procedure required her to write a letter to the Hospital Authority following Wright's decision to reassign her, after addressing this matter with him. Since her former position had been discontinued when Wright delegated her duties as Director of Human Resources to other department heads, she could not be reinstated.
 
 
 39
 In accordance with the Personnel Policy Handbook regarding terminations, Wright informed Adams orally on several occasions and in writing on October 7, 1986, that her difficulty in working with Memorial personnel was a serious problem. Adams' interpersonal relations with Memorial employees did not improve. The evidence showed that the disciplinary manual, which Adams drafted and upon which she has relied for the due process allegedly denied her, was not approved by the department heads, Wright or the Hospital Authority. Therefore, she cannot derive a property interest in her continued Memorial employment with due process rights from this unofficial source, despite its use by Adams and some department heads, unknown to Wright.
 
 
 40
 Rather than demonstrating any discriminatory motivation, Adams' termination was because of her inability to work with other Memorial personnel. Under Georgia law, she was an at-will employee, terminable by her employer Memorial at any time with or without cause. As an at-will employee, she was not entitled to procedural due process in connection with her termination. The district judge properly directed the verdict as to plaintiff-appellant's lack of a property interest in her continued employment as Director of Human Resources at Memorial. Accordingly, we AFFIRM.
 
 
 
 *
 Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 Adams left the state hospital because that facility elected not to renew her employment past her six-month probation period
 
 
 [2]
 The Personnel Policy Handbook provides the following grievance procedure:
 GRIEVANCE PROCEDURE
 At one time or another, we all have problems with our work. If these can be discussed freely and sincerely, we often find immediate solutions. Feel free to talk over any problems with your supervisor.
 A grievance is defined as a dissatisfaction that occurs when an employee thinks that any condition affecting him is unjust, inequitable, a hindrance to effective performance or creates a problem. A formal system is available for resolving grievances and any employee may use the following procedures.
 FIRST STEP-YOUR SUPERVISOR: In order to minimize the possibility of misunderstanding, employees are requested to talk over their problems or grievances with their immediate supervisor within 10 days of the occurrence of the problem creating the grievance. The supervisor will investigate, evaluate and provide a solution or explanation within three work days.
 SECOND STEP-YOUR DEPARTMENT HEAD: If a satisfactory answer or settlement from the immediate supervisor is not received within three work days, you will be allowed three work days to refer your problem in writing to the department head. You may obtain assistance in preparing the written presentation of your problem, and may be accompanied by another employee, if you wish, while you present the problem to your department head. You will be provided an answer from your department head within three work days of your presentation.
 THIRD STEP-YOUR EXECUTIVE DIRECTOR: If you are not satisfied with the recommendations provided by your department head, you have an additional three work days to request an appointment for a personal interview with the Executive Director who will discuss the problem with you and investigate all aspects of it thoroughly and provide a decision within five work days.
 Because the full responsibility for the operation of the institution has been delegated to the Executive Director, any decision rendered in a problem situation by the Executive Director, must be regarded as final and binding; except employees may appeal such a decision, if they wish, by submitting a written request for a review addressed to the Chairman of the Hospital Authority in care of the Hospital.
 Arrangements for an interview with representatives of the Hospital Authority will be arranged with the employee within 10 days of receipt of the written request for a review.
 Memorial Hospital and Manor Personnel Policy Handbook, Grievance Procedure, ch. VII, Sec. 7.1 (1979).
 
 
 [3]
 The following examples are representative complaints of Adams' interfering conduct made to Wright, as Executive Director of Memorial. Cynthia Vickers, who was hired as Director of Nursing in February, 1984, testified that Adams misinformed prospective nurses as to their responsibilities during her screening of them. R3-391. Vickers had to correct these statements, and she lost registered nurses because their job was not as Adams had described. R3-391-92. Although Adams admitted that she did not have termination authority, she nevertheless discharged one of Vickers' nurses on a day that Vickers was not at work. R2-185; R3-392. Dr. Sidney Cochran, Memorial Chief of Staff from approximately 1984 to 1986, testified that Adams was a disruptive influence on the nurses and that the morale of the nursing staff affects patient care. R1-476-77
 
 
 [4]
 For example, the Director of the Pharmacy at Memorial complained that Adams was interfering with his hiring by quoting salary amounts different from those that he intended to offer to prospective employees. R3-366-67. The Director of Food Service also reported to Wright that Adams was interfering with his operation at Memorial. R3-380
 
 
 [5]
 Since her appointment as Director of Human Resources, Adams testified that she had accomplished several special projects assigned by Wright. Lasting three to six months, planning and in preparation, these projects included the Health Fair and the Memorial Run. R3-232-33
 
 
 [6]
 With respect to Adams' analytical and documentary skills, Wright testified as follows:
 Mrs. Adams is very intelligent. She is very paper oriented, if I can make myself clear on that. She did a fine job in those areas. She had difficulty working with people, especially people that were in authority over her--probably including myself.
 R3-302. Dr. Charles Walker, Memorial Chief of Staff in 1986, and Dr. Sidney Cochran, the preceding Memorial Chief of Staff, respectively complimented Adams' work in quality assurance and accreditation, but both recognized her problems with interpersonal relations. R1-442-44, 475-76.
 
 
 [7]
 Following Adams' removal from her position as Director of Human Resources, Wright learned that she was inquiring concerning dietetic classes for patients when she no longer had training responsibilities. Including this latest incident, Wright wrote the October 7, 1986 memorandum in order to document the sequence of events that led to Adams' removal from her former position and her conduct thereafter. R3-338
 
 
 [8]
 Adams testified that she took sick leave on October 16, 17, 23, 24, 25 and 28 for depression, which kept her from eating and sleeping and caused her to see two doctors and to obtain prescriptive medication. R2-126-28. Plaintiff-appellant's expert Dr. Harry Krop, a psychologist who examined Adams on April 8, 1988, and November 7, 1988, testified that Adams was "consumed" or obsessed with her perception of her demotion and ultimate termination, manifested by clinical symptoms of depression. R1-410, 418-19, 421, 427-28, 433, 438-39
 
 
 [9]
 Adams admitted that Wright, as Executive Director, had authority to determine her job at Memorial and that her October 29, 1986 letter requested him to reverse his personnel decision regarding her reassignment. R2-170-71, 174
 
 
 [10]
 Memorial Hospital and Manor Personnel Policy Handbook, Grievances, ch. VII, Termination of Employment, ch. VIII
 
 
 [11]
 Examples of reasons for immediate discharge without notice or benefits are drug abuse, theft, absolute refusal to comply with instructions from an authorized supervisor, and falsification of personnel or other records. Memorial Hospital and Manor Personnel Policy Handbook ch. VIII, Sec. 8.2
 
 
 [12]
 In contrast to her allegations that Wright treated her unfairly regarding her reassignment and termination, Adams admitted that he was responsible for her pay tripling from $4.00 to $13.30 per hour and her responsibilities progressing during her full-time employment at Memorial from 1977 until 1986. R2-175-76; R3-357. Wright testified that he progressed Adams "about as fast as you could any other employee." R3-318. Interestingly, Adams, a Filipino, has contended in this action that Wright, who progressed her for a nine-year period and placed her in positions formerly held by native Americans, developed a dislike for her because she was born in the Philippines and that this prejudice caused him to relieve her of her duties as Director of Human Resources and to terminate her. R2-178-84. We find no merit in this contention, particularly, when Adams admitted that Wright never indicated to her that being Filipino affected her job performance at Memorial and that her termination may have had nothing to do with her ethnic heritage. R2-176, 185. Likewise, Adams has argued that Wright made an issue of her inability to speak understandable English immediately preceding her termination. She conceded, however, that Wright had told her throughout her employment at Memorial that her speaking ability was an impediment to her communication with other personnel. R3-245
 
 
 [13]
 Wright testified that no one replaced Adams as Director of Human Resources, but that the responsibilities of that position were absorbed by other department heads. R3-356-57
 
 
 [14]
 Adams based her causes of action against defendants on the following allegations: First Amendment--defendants maliciously and willfully punished her in contravention of her freedom-of-speech liberties, protected by the First and Fourteenth Amendments, when she criticized violations of Memorial policies and procedures; Fourteenth Amendment--defendants deprived Adams of her property interest in continued employment with Memorial without affording her notice and a hearing, differing from the procedure used for other Memorial employees in violation of her Fourteenth Amendment due-process and equal-protection rights; 42 U.S.C. Sec. 1981--defendants failed to give Adams full benefits accorded to white persons because of her Philippine origin; 42 U.S.C. Sec. 1983--defendants, under color of state law, purposefully and with reckless and careless indifference deprived Adams, a protected class member under Sec. 1983, of constitutional rights, privileges and immunities. Adams based her color-of-state-law allegations on the authority of the Hospital Authority to operate Memorial and to make personnel decisions pursuant to O.C.G.A. Sec. 31-7-72 and Sec. 31-7-75 (1985). She also claimed attorneys' fees under 42 U.S.C. Sec. 1988, and she requested general damages of $500,000.00, punitive damages of $2,000,000.00 and damages of $250,000.00 for emotional distress, humiliation and damage to her reputation. The parties stipulated to dismissing the action as to the Hospital Authority members in their individual capacities
 
 
 [15]
 Defendants' five directed-verdict motions made at the close of plaintiff's case were: 1) a general directed-verdict motion as to the entire case, 2) a directed-verdict motion that Adams lacked a property interest in her continued Memorial employment that would entitle her to procedural due process, 3) a directed-verdict motion that defendants had not violated Adams' First Amendment privileges, 4) a directed-verdict motion that Adams had not shown that she did not receive full benefits accorded to white persons under 42 U.S.C. Sec. 1981, and 5) a directed-verdict motion that no willful or evil intent had been shown in the evidence presented to submit the question of punitive damages against Wright individually to the jury. R1-446-53
 
 
 [16]
 Jurisdiction in this court is based upon the district judge's final decision, directing the verdict as to Adams' not possessing a property interest in her continued employment at Memorial. 28 U.S.C. Sec. 1291 (1982)
 
 
 [17]
 The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc)
 
 
 [18]
 The former Fifth Circuit instructively has detailed the analysis for determining when a directed verdict is appropriate:
 On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 Boeing Co., 411 F.2d at 374-75 (footnote omitted).
 
 
 [19]
 The Eleventh Circuit has reviewed the Georgia law of property interest in public employment as follows:
 In Georgia, "[g]enerally, one in public employment has no vested right to such employment...." Barnes v. Mendonsa, 110 Ga.App. 464, 465, 138 S.E.2d 914, 915 (1964). Unless the employment arrangement is modified by additional contractual or statutory provisions, the "power to hire carries with it the implied power to fire." Richmond County v. Jackson, 234 Ga. 717, 719, 218 S.E.2d 11, 12 (1975); see Brownlee v. Williams, 233 Ga. 548, 212 S.E.2d 359 (1975). The right to continued employment may arise where there is a guarantee of employment for a fixed term, see Lentz v. City Council, 48 Ga.App. 555, 556, 173 S.E. [ ] 406 (193, or where the employment allows termination only for cause, Brownlee v. Williams, 233 Ga. at 551, 212 S.E.2d at 362 (construing Civil Service Act of Fulton County).
 Ogletree v. Chester, 682 F.2d 1366, 1369-70 (11th Cir.1982) (footnotes omitted).
 
 
 [20]
 Although precedential and dispositive of the employment property interest at issue in this case, neither party cited Wofford to this court. On January 23, 1989, the Eleventh Circuit affirmed the district court in Wofford by adopting the order granting summary judgment to defendants by Chief Judge Alaimo of the Southern District of Georgia. Appellant's brief was filed on April 12, 1989, and appellees' brief was filed on May 12, 1989
 
 
 [21]
 Steps one through four were filing a written complaint and receiving a written reply. Wofford, 864 F.2d at 118
 
 
 [22]
 The plaintiffs in Wofford filed their action under 42 U.S.C. Sec. 1983. Because the defendant hospital was a public hospital authority pursuant to O.C.G.A. Secs. 31-7-1 to -285 (Supp.1989), the court found that its actions were state acts under Sec. 1983. Wofford, 864 F.2d at 118 (citing Richards v. Emanuel County Hosp. Auth., 603 F.Supp. 81, 83 (S.D.Ga.1984))
 
 
 [23]
 34-7-1. Determination of term of employment; manner of termination of indefinite hiring
 If a contract of employment provides that wages are payable at a stipulated period, the presumption shall arise that the hiring is for such period, provided that, if anything else in the contract indicates that the hiring was for a longer term, the mere reservation of wages for a lesser time will not control. An indefinite hiring may be terminated at will by either party.
 O.C.G.A. Sec. 34-7-1 (1988) (emphasis added).
 
 
 [24]
 Wofford interpreted the subject city regulations, which Glenn held created " 'a reasonable expectation of continued employment absent noncompliance with one of the specified reasons' [for dismissal]," when coupled with the review procedure provided by the city, as being analogous to termination for cause, establishing a constitutionally protected property interest in plaintiff's employment. Wofford, 864 F.2d at 119 (citing Glenn, 614 F.2d at 471-72). Similarly, Wofford contrasted the Barnett determination that the Personnel Policy of the Atlanta Housing Authority permitted involuntary dismissal explicitly for cause, in the absence of a general reduction in the work force, and mandated extensive review procedures of terminations, the combination of which conferred a valid property interest in continued employment by limiting the power of the appointing body to dismiss an employee. Wofford, 864 F.2d at 119 (citing Barnett, 707 F.2d at 1576-77). As opposed to these cases, Wofford reinforced its position by citing Georgia federal cases where personnel policies were held not to create protectable property interests in continued employment because for-cause termination was not established. Wofford, 864 F.2d at 119 (citing Barlow v. Atlanta Housing Auth., 592 F.2d 280 (5th Cir.1979) (per curiam); Harrison v. Housing Auth., 445 F.Supp. 356 (N.D.Ga.1978), aff'd, 592 F.2d 281 (1979) (per curiam))
 
 
 [25]
 We acknowledge a recent Eleventh Circuit case, holding that a terminated state employee in Georgia had a property interest in continued employment and that he was deprived of due process. Brown v. Georgia Dep't of Revenue, 881 F.2d 1018 (11th Cir.1989). That case, however, is distinguishable because the terminated employee was permanent in status and covered by the Georgia Merit Systems Act, O.C.G.A. Secs. 45-20-1 to -16 (1982 & Supp.1989), which provides permanent-status employees due-process rights under the rules and regulations of the State Personnel Board. Furthermore, the court specifically stated that Wofford and Garmon did not control because the Garmon plaintiff conceded that she was an at-will employee and the Georgia Supreme Court had held that an employee under the Georgia Merit Systems Act is entitled to rely on the State Personnel Board regulations as the terms of his contract. Brown, 881 F.2d at 1026 (citing Clark & Stephenson v. State Personnel Bd., 252 Ga. 548, 314 S.E.2d 658 (1984))