Shirley P. **PETERSON,**
Plaintiff–Appellant,

v.

The **ATLANTA HOUSING AUTHORITY, Jane Fortson, in her capacity as Chairman of the Board of Commissioners of the Housing Authority . of the City of Atlanta, et al., Defendants–Appellees.**

No. 92–8318.

United States Court of Appeals, Eleventh Circuit.

Aug. 20, 1993.

Susan B. Ellis, Office of Susan B. Ellis, Decatur, GA, for plaintiff-appellant.

Benjamin W. Spaulding, Jr., Atlanta, GA, for defendant-appellee Bettye Davis.

Adam J. Conti, Mack & Bernstein, Atlanta, GA, for all other defendants-appellees.

Before FAY and DUBINA, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FAY, Circuit Judge:

Shirley Peterson, a former employee of the Atlanta Housing Authority ("AHA"), appeals several rulings of the district court as erroneous in her suit against AHA challenging her termination from her job as a violation of her rights to substantive and procedural due process, a violation of her First Amendment rights, a state breach of contract, and an unlawful conspiracy in violation of 42 U.S.C. § 1983. The district court dismissed Peterson's claims as to substantive and procedural due process insofar as they relied on a claimed liberty interest, finding that Peterson's complaint failed to state a claim under the relevant law. At the same time, it also dismissed Peterson's state law breach of contract claim. Those rulings we AFFIRM. However, in a later order on cross motions for summary judgment, the district court granted summary judgment in favor of the appellee, AHA, on all of Peterson's remaining claims. In so doing, the district court relied heavily on this Court's opinion in *Warren v. Crawford*, 927 F.2d 559 (11th Cir.1991), holding that the reasoning in *Warren* dictated a finding that Peterson did not have a property interest in her job. Because we find that *Warren* does not apply, we REVERSE as to

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

all of Peterson's claims which are based on a property interest and hold she had a protectable property interest in her job. Finally, because we find that the speech in question here can be "fairly characterized as constituting speech on a matter of public concern ..." *Ferrara v. Mills*, 781 F.2d 1508, 1512 (11th Cir.1986), we also REVERSE the district court's summary judgment on the First. Amendment issue.

## I. BACKGROUND

*Facts*

Shirley Peterson was hired by the Atlanta Housing Authority on April 10, 1972 and became a permanent employee on October 2, 1972. For the next seventeen years her employment record reflected a steady climb up the ladder at AHA in terms of promotions, pay increases and increased responsibility [1] until February of 1989 when she was transferred to a newly created, unbudgeted, temporary position entitled "Area II Auditor (Acting)." One month later this position was abolished in a system-wide reorganization of AHA. At that time some 100 employees were notified that their positions would be abolished under the reorganization and that "[t]he Personnel Policies governing a reduction in force will be in effect." R3–26 (Exhibit F) at 1. However, they were simulta-

neously notified that, in contrast to an earlier "reduction in force," [2] most of the abolished positions had new analogues under the planned reorganization for which the affected employees were invited to apply. Indeed, the plan called for the *creation* of 125 [3] new positions, leaving open the possibility that no one would actually be terminated as a result of this reorganization.

In fact, all but five of the employees affected by the reorganization were rehired.[4] However, the employees who were rehired first had to apply for the open positions in the new structure and go through some sort of interview process.[5] Shirley Peterson applied for eight of the new positions created by the plan, including the manager position at the Gilbert Gardens complex which she had held prior to her reassignment to the temporary auditor position. Given AHA policies, she had good reason to be optimistic about her chances of being chosen for some position. The AHA personnel policy governing reductions in force reads "A regular full-time employee affected by a reduction-in-force *shall* be transferred to a vacant position in another position classification based on qualifications, experience and past performance." R3–27 (Deposition of C. Geeter) Exhibit 4 (AHA Personnel Policy Manual) at 59, Policy No. 7–3, Sec. 5 (emphasis added).[6]

---

1. The one exception appears to be a reassignment of responsibilities in May of 1988 which reduced the number of projects for which she was responsible from four back to the two she had originally managed. This change did not involve any reduction in pay, nor does the record reflect that it was made for any reason related to Peterson's performance.

2. In a communication to all employees, the Executive Director of AHA was careful to make this distinction.

 *Unlike* the "Reduction-in-force" reorganization in 1981 ... [t]his reorganization is not the result of a budget shortfall and gross operational inefficiencies as in 1981.
 R2–26 (Exhibit G) at 2 (emphasis added).

3. There are some minor discrepancies in the numbers asserted at various times relating to the number of persons affected by the reorganization and the number of new positions created, but we do not view these discrepancies as significant. It appears to be agreed that more positions were created than were eliminated.

4. *See* R3–27 (Deposition of C. Geeter) at 162 and Exhibit 6 (List of Personnel Affected by Reorganization).

5. No one connected to the interview process seems to remember much about it and none ..gives the same account of it from what they do remember. *See* R4–33 Deposition excerpts Freeman, Davis, Murray, Geeter and Byrár. Apparently not all of the persons affected by the reorganization had to undergo an interview, but were simply retained in their old jobs under ·the new title. *See* R3–27 (Deposition of Geeter) at 119.

6. Section 6 of this same policy reads that "[e]mployees who have been laid off because of a reduction in force *shall* receive preferred consideration for re-employment...." *Id.* (emphasis added). And in Policy No. 7–1 AHA states, "[t]he Authority believes that all current employees should have the first opportunity to fill available vacancies ...," and that it "will make every effort to fill job vacancies from current employees." *Id.* at 56. We note in passing that in numerous places the policy manual uses the mandatory word "shall" versus language which

*See also* Deposition of Geeter at 143 (employees were informed "that they could refer to [the] personnel policy for information regarding the reduction in force."). Nevertheless, in a letter dated April 28, 1989, Peterson was informed that she had not been selected for any of the positions for which she had applied. Thereafter she was notified that she was being terminated due to a reduction in force effective May 1, 1989.

This letter did not invite Ms. Peterson to apply for any open positions and did not reveal to her that several positions, including the analogue to her former position at Gilbert Gardens (for which she had applied), in fact remained unfilled. The evidence reflects this omission was contrary to the practice followed with other employees. *See* R3–27 (Deposition of Geeter) at 180–81. The record also shows that the manager position at Gilbert Gardens remained open after the reorganization, notwithstanding the representation made to employees that an effort would be made to fill the vacancies generated by the reorganization from "within our ranks." R3–26 (Exhibit G) at 1.

AHA does not now assert that Peterson was unqualified for any of the open positions, nor is there any indication in her record of poor performance which would have disqualified her for consideration under this section. Instead, AHA merely asserts that the panel responsible for interviewing candidates was "unimpressed by Peterson's presentation," [7] Appellees' Brief at 14, although she was apparently not asked any questions nor told that she was expected to make a "presentation." No one else involved with the process appears to remember anything about Peterson's "interview" or why she was not chosen to fill any of the vacancies for which she applied. Given the failure to ask questions, the interviewers' sketchy recall, the absence of negative information in Ms. Peterson's personnel record and the length of her experience with AHA, it's difficult to judge the true meaning of this exercise.

According to Peterson, the explanation for all of the foregoing anomalies is that certain persons within AHA, particularly Deputy Director Bettye Davis, were already determined to terminate her. She alleges that both her transfer to an unbudgeted, temporary position, and her later termination under the guise of a reduction in force, occurred because of her attempt to call attention to maintenance problems within her projects and her refusal to "pre-lease" units in the project she managed. For some time Peterson had been informing her supervisor, Yolanda Jackson, of problems she was experiencing in maintenance due to the number of vacancies in her budgeted maintenance slots. According to Peterson, the chronic understaffing of her maintenance crew meant that she was unable to keep abreast of maintenance at Gilbert Gardens. On several occasions she had asked, through Jackson, to meet with officials higher up in the chain of command to discuss these problems. This situation was brought to a head when Jackson asked Peterson to pre-lease units in the project.

"Pre-leasing" apparently involved Peterson having to list as "available for occupancy" units which did not meet either HUD requirements in terms of habitability or the same requirements contained in the lease agreements which would be signed by the

---

would indicate that a particular policy is discretionary.

7. We note that the appellees' cite to page 166 of the Geeter deposition does not fully support this assertion as there is no reference on page 166 which corresponds to this statement. Geeter's only recollection which lends support to this statement is that, in the discussion after she left, "there was some concern that she [Peterson] didn't really seem interested in discussing her application; that, you know she made no comments to the panel and seemed to have no interest in talking to the panel." R3–27 (Deposition of Geeter) at 168. On pages 167–68, Geeter

testifies that the "interview" consisted of his asking Ms. Peterson if "she had any comment she'd like to make to the panel, and she indicated no." *Id.* at 167. He further testified that he didn't remember anyone else asking her any questions, nor could he remember whether anyone had her personnel file at the "interview." *Id.* at 168. Shirley Peterson's account of the "interview" generally corresponds to Geeter's on these points. *See* R3–25 (Deposition of Shirley Peterson) Vol. 2 at 249 ("Nobody said anything. They just sat there and looked at me."). Suffice it to say these accounts describe a very unusual "interview."

tenants.[8] Her supervisor's position on the request to pre-lease some units was that the affected units would be ready by the time the tenant actually moved in because of the new maintenance "team" concept which Jackson was attempting to use to get units ready for occupancy.[9] Peterson's response was that, based on her experience with the maintenance teams' work and because of the inadequacy of her own maintenance staff, she had no reason to believe that these units would actually be ready for occupancy when required. When she was directed by Jackson to pre-lease units which did not meet HUD standards, Peterson refused unless Jackson could assure her in writing that the pre-leasing practice was acceptable to HUD. The next day Peterson was transferred by Jackson to the temporary auditor position. Jackson testified that she did not consider Peterson's transfer to be disciplinary in nature but rather was made because she "thought a change would be good," suggesting that Peterson was "burned out." R4–33 (Deposition of Jackson) at 98.

Peterson viewed the transfer as a demotion even though it was not officially so designated, and even though she received no reduction in pay, because it involved a substantial diminution in authority and was a position that was essentially created for her transfer. Therefore, she filed a grievance protesting her transfer. A hearing was held on March 1, 1989. However, before a decision was rendered, AHA's Board of Directors authorized the aforementioned reorganization. Apparently, the responsible persons at AHA felt that the reorganization mooted Peterson's grievance because no decision was *ever* rendered on it and the events described above in connection with the reorganization took place, ending in Peterson's termination.

Peterson alleges that her termination was also, in part, in retaliation for her having filed the grievance and that both prior to and throughout the grievance proceeding defendant Bettye Davis expressed hostility towards her. Peterson asserts that she was never really considered for any of the vacant positions created by the reorganization because the defendants were using the process as a screen behind which they could get rid of her to silence her without revealing their motives. It is undisputed that defendant Davis was one of the principal architects of the reorganization and its implementation.

One further set of facts is relevant to this dispute. Throughout Peterson's employment with AHA the Authority has maintained a Personnel Policy and Procedures Manual. In 1983 this Court held that a 1977 version of this manual created a property interest in employment for AHA's employees, in part because of the "just cause" language therein.[10] *See Barnett v. Atlanta Housing Au-*

8. Although the record does not reflect that HUD has specifically disapproved of this practice or passed on its legality, it does reflect that HUD has regulations concerning standards for habitability called Housing Quality Standards which it requires the Public Housing Authorities under its jurisdiction to meet and which AHA failed to meet. It also reflects that HUD had experienced numerous problems with discrepancies, in the reports on vacancy and occupancy rates submitted by AHA, from the data revealed by its own audits. *See* R4–33 Exhibits f, h & m (letters from HUD officials to AHA's Executive Director). This evidence supports, at least inferentially, Shirley Peterson's claim that the pre-leasing practice was improper. Of course, at trial AHA would have the opportunity to submit evidence that the practice was approved and that it was within its authority to require Peterson to comply with it.

9. The maintenance team concept was apparently not used throughout AHA and represented an alternative to the budgeted maintenance staff assigned to each project. *See* R4–33 (Deposition of Jackson) at 27–28. However, in order to compile these maintenance teams or crews, maintenance persons were pulled from existing staff in Jackson's areas, including one person from Shirley Peterson's already understaffed maintenance work force. *Id.* at 28. Thus, in spite of Peterson's pleas that her vacant maintenance slots be filled, not only was she not given additional staff but her staff was actually decreased.

10. The panel in *Barnett* did not rely merely on the presence of the words "just cause," but rather looked at the manual in its entirety citing also the numerous specific illustrations of types of conduct deemed unacceptable to AHA and the "extensive review procedures which allowed an employee to challenge the termination decision." *Barnett*, 707 F.2d at 1576–77. Numerous illustrations of unacceptable conduct and extensive review procedures are still a part of the most recent version of the manual. *See, e.g.*, R3–27 (Deposition of Geeter) Exhibit 4 at 73–76, Policy No. 8–2 (Corrective Discipline Policy and Procedure) and at 78–80, Policy No. 8–4 (Rules of Conduct).

**910**

*thority,* 707 F.2d 1571, 1576–77 (11th Cir. 1983). The AHA subsequently made revisions to this policy manual in 1986.[11] One of the many revisions made was to remove all of the "just cause" language and insert language intended to establish that employment at AHA was "at will." [12] In spite of the fairly significant change this would mean to employees, this revision was not emphasized to the employees, nor were the words "at will" ever used in any communication to the employees of the changes. *See, e.g.,* R3–26 Exhibits 7, 9 & 10. In fact, the language employed appears calculated to reassure employees that no significant change was made in this area.

For example, in a list entitled "Significant Changes Made in Restatement of Personnel Policy Manual" the section entitled "Employment Status" is identified as *"Same as present Policy* No. 5.1 *with some change in language."* R3–26 (Exhibit 7) at 1 (emphasis added). To the extent that the prior policy established a "just cause" employment relationship, a change to "at will" hardly seems fair to describe as the "same policy." Indeed, in reviewing the revisions made, such a change would clearly constitute the *most* significant of all of the revisions made at that time because it would affect *all* regular employees. The evidence reflects that many employees were unaware of any change in status and the old "Termination for Cause" forms were still in use after the revisions. *See, e.g.,* R4–33 (Deposition of Jackson) at 86, and R3–26 (Exhibit 12–1).

Moreover, even the revised language is ambiguous. *See* R3–27 (Deposition of Geeter) Exhibit 4 at 54, Policy No. 6–9. The "Employment Status" section, as revised, reads as follows: "Employees are hired at the Authority for an indefinite period of time. While the Authority hopes that its employees will remain employed with us until retirement, we all know that events and circumstances may result in employees voluntarily terminating their employment at any time *or being terminated for reasons set forth in these policies." Id.* (emphasis added). While the first sentence of this passage, standing alone, mirrors the Georgia statute regarding when employment will be considered "at will," *see* O.C.G.A. § 34–7–1 (1992),[13] its impact is undercut by the lack of symmetry in the second sentence. Although employees are told that *they* may voluntarily terminate their employment "at any time," they are also told that they may only *be* terminated "for reasons set forth in these policies." Notwithstanding AHA's insistence that this language "speaks for itself," [14] we cannot clearly discern what it is saying. We

11. AHA had also amended its policy manual in 1980, however the "for cause" language was not removed until the 1986 revisions, therefore we do not find these revisions relevant.

12. The revision to the employment status of employees was only one of numerous changes made at the time.

13. "An indefinite hiring may be terminated at will by either party." O.C.G.A. § 34–7–1 (1992). With respect to public employees, this rule may be modified by regulations, rules or policies establishing that dismissal will only be "for cause." *Warren v. Crawford,* 927 F.2d 559, 562 (11th Cir.1991).

14. When asked to explain the meaning of this passage the Director of Personnel, C. Gordon Geeter, refused to clarify it beyond saying "The language speaks for itself," R3–24 (Deposition of Geeter) at 47, or simply restating the language itself. *Id.* at 48. ("[I]t's to let employees know that they're hired for an indefinite period of time."). Geeter steadfastly refused to admit that this represented a "change" in any existing poli-

cy, *id.* and instead insisted it represented a "clarification of existing policy." *Id.* at 50. Initially in the deposition Mr. Geeter disclaimed any knowledge *of intending to get rid of the* "for cause" language saying, "I never really thought about it. You know, we rewrote the policies, but I don't remember specifically that we didn't put for cause." *Id.* at 29. This statement would appear merely disingenuous were it not for his later admission that the language in the manual was changed, upon advice of counsel, in response to the *Barnett* decision, *id.* at 34–35, 39 & 52–53, a decision he initially had to be prompted to recall, *id.* at 18, but about which he later offered this comment, "I didn't agree with the decision of the Court, for what it's worth." *Id.* at 34. Geeter testified that "we [AHA] consciously put into the policy language to make it very clear as to why people can be terminated ..." because of the lack of "clarity" injected "as a result of the *Barnett* case." *Id.* We find that this language neither "clarifies" employees' status nor informs them of "why" they may be terminated. Indeed, at the very heart of the at will doctrine is the absence of the need for a "why" when terminating employees.

think a reasonable employee might be led to believe from the above that he could only be dismissed for cause.[15] Nevertheless, AHA insists that this section, and other similar sections throughout the manual establish that employment at AHA is at will.[16]

*Procedural History*

Shirley Peterson filed suit against the AHA and various individual employees of the Authority claiming that her termination was in violation of her constitutional rights to procedural and substantive due process based on her claimed liberty and property interests in her job. She further alleged her termination was in violation of her rights under the First Amendment because she was retaliated against for her speech on matters of public concern, namely her protests concerning the pre-leasing practice and her frequent requests for maintenance assistance. A third count was based on 42 U.S.C. § 1983 and a fourth asserted a state law breach of contract claim.

In an order dated October 3, 1990, the district court dismissed Peterson's breach of contract claim and all of her claims relying on an asserted liberty interest finding that Peterson had failed to sufficiently allege the elements necessary to the latter and that state law provided no basis for the former. Following discovery, Peterson made a motion for partial summary judgment and the defendants made a motion for summary judgment on all of the remaining claims. In an order

dated March 3, 1992 the district court granted defendants' motion and ordered summary judgment against Peterson on all of her outstanding claims.

In particular, the court found that AHA's 1986 employee manual did not create a property interest because it read the manual to give the Executive Director vast discretion to terminate employees with or without cause. Relying on this Court's opinion in *Warren*, it held this discretion precluded the creation of a property interest for employees in their jobs. The court further found that no claim to a property interest could be based on "explicit mutual understandings," or on the earlier versions of AHA's manual, because in all of these manuals the Authority had expressly reserved the right to modify its policies. As to Peterson's First Amendment claim the district court held that Peterson's speech did not involve matters of "public concern" and therefore First Amendment protection did not apply. We review Peterson's appeal of these two orders.

## II. DISCUSSION

*Standard of Review*

■ We review *de novo* orders granting a motion for summary judgment. *Warren v. Crawford*, 927 F.2d 559, 561 (11th Cir.1991). Although this inquiry is usually limited to whether there exists any genuine issue of material fact, FED.R.CIV.P. 56(c), in this case

---

15. In fact, it is possible to infer, from its representatives' testimony and its communications to employees discussed *supra*, that AHA knew this and intended employees to interpret the language in this fashion.

16. One of the arguments advanced by AHA is that several provisions in the new manual vest the Executive Director with substantial discretion, and that, under *Warren*, this discretion prevents the creation of any property interest in employees. Appellees' Brief at 24. We find this argument unpersuasive for a number of reasons. In the first place, the mere recitation of some "magic words" in portions of the manual does not suffice to create substantial discretion, rather the policy must be read in its entirety. The discretion referred to by Appellees is explicitly conferred *only* on the Executive Director. *See* R3–27 (Deposition of Geeter) Exhibit 6 at 9, Policy No. 1–4 ("Supervisors, department heads and Division Directors *must act in full compli*-

ance with these policies and procedures unless specifically authorized by the Executive Director in writing or if emergency circumstances are present.") (emphasis added). This is far from a broad grant of discretion to the agency as a whole and does not suggest that all employees will be covered by the Executive Director's discretion. Also, even the Executive Director's discretion is limited to actions "in the spirit of the policies and procedures, notwithstanding that his actions may not be totally consistent with the letter of these policies." *Id.* This does not read as a grant of unfettered discretion. Finally, although the termination policy grants the Executive Director discretion to terminate employees for "other lawful or nondiscriminatory reasons," *id.* at 77, Policy No. 8–3, to argue that Peterson's termination is justified under this section as an "other lawful reason" begs the question since its unlawfulness is the very thing she is attempting to establish.

the issues raised were decided as matters of law. "The district court's conclusion of law is subject to complete and independent review by this court." *In re Sure–Snap Corp.*, 983 F.2d 1015, 1017 (11th Cir.1993). Similarly, "[e]rrors of law in evaluating the dismissal of [a] complaint are subject to plenary review by this court." *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir.1992). For purposes of reviewing a decision to grant a motion to dismiss, all the allegations in the complaint must be taken as true and read in the light most favorable to the plaintiff. *Id.* "A complaint may not be dismissed unless the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (citing *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249, 109 S.Ct. 2893, 2905, 106 L.Ed.2d 195 (1989)). We will deal first with the issues decided in the 1990 order of dismissal.

*Order of September 28, 1990*

### A. Liberty Interest

 In order to state a claim based on a liberty interest the plaintiff must allege (1) stigmatizing information; (2) which is false; (3) made public; (4) by the governmental organization. *Thomason v. McDaniel*, 793 F.2d 1247, 1250 (11th Cir.1986) (per curiam). The district court held that Peterson had "failed to allege that AHA made public any false information about her to the public." R1–12–8. "Defendants are not on notice as to what false public statements they may have made which form the basis of Plaintiff's claim." *Id.* In objecting to this order, the plaintiff primarily relies on an argument that she should have had an opportunity to develop facts in support of her claim and that a "motion to dismiss was an improper procedural vehicle for such a decision." Appellant's Brief at 45.

 Plaintiff is correct in describing pleading requirements under the federal system as generally liberal ones for plaintiffs. Appellant's Brief at 38. However, a court's duty to liberally construe a plaintiff's com-

plaint in the face of a motion to dismiss is not the equivalent of a duty to re-write it for her. Even read liberally, Peterson's complaint is devoid of reference to any injury inflicted upon her by AHA in any statements made public concerning her termination, even in her personnel file. *See Buxton v. City of Plant City, Florida*, 871 F.2d 1037, 1045 (11th Cir.1989) (information in a personnel file of a public entity may constitute sufficient "publication" for purposes of claimed liberty interest). Indeed, the words "liberty interest" do not even appear in the complaint, rather Peterson relies on a general allegation that her termination denied her "substantive and procedural due process" under "the Fifth and Fourteenth Amendments to the Constitution," R1–1–10, and a general allegation of "embarrassment" and "damage to her professional reputation." *Id.* at 13.

Terms like "due process" are inherently vague and such claims may rest on a virtually infinite number of factual scenarios. While we are mindful of the liberal construction rules plaintiff cites to us, we do not think it overburdensome for her to be required to allege the factual basis for her claim. The law is clear that Peterson's claim of damage to her reputation cannot be based, in the face of employer silence, on the mere fact that she was terminated. *See, e.g., Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) (per curiam); *Board of Regents v. Roth*, 408 U.S. 564, 575, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). Rather, the circumstances of the termination must be pleaded with sufficient clarity so as to "give the defendant fair notice of what the plaintiff's claim is *and the grounds on which it rests.*" *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (emphasis added). Peterson simply failed to satisfy the second part of the *Conley* test with respect to her claimed liberty interest. Therefore, we affirm the dismissal of her claims which rely on any liberty interest.[17]

---

**17.** From the facts in the record it seems clear that Peterson may have had a factual basis for her claim because some statements made to the media in connection with the reorganization were patently false. *See* R4–33 (Exhibit 7). For example, in a newspaper interview defendant

Bettye Davis said that all of the terminated employees had "reapplied for only one job—their own." *Id.* This statement, as the record shows, was false as to Peterson. Nevertheless, she must plead those facts in order to survive a motion to dismiss.

### B. State Law Breach of Contract

█ Peterson's claim under state law suffers from a similar infirmity as her asserted liberty interest. In dismissing this claim, the district court relied on the 1986 version of AHA policy manual stating that the term of employment was indefinite and therefore, under Georgia law, could not form the basis of a valid employment contract. R1–12–15. Peterson objects to this ruling as improperly based on matters outside the pleadings, to wit, the 1986 manual. Appellant's Brief at 38–39. Peterson is correct that this reliance clearly converted the motion to dismiss into a motion for summary judgment without the proper notice to her and an opportunity to respond.

> This circuit has *consistently* enforced the strict notice requirements of Rules 12(b) and 56, creating a bright-line rule: If a district court fails to comply with the ten-day notice requirement, the case will be reversed and remanded so that the district court may provide the non-moving party with adequate notice.

*Jones v. Automobile Ins. Co. of Hartford, Conn.,* 917 F.2d 1528, 1532 (11th Cir.1990) (emphasis in original).

█ This rule is subject to the "limited exception" of harmless error in certain "unique circumstances." *Donaldson v. Clark,* 819 F.2d 1551, 1555 n. 3 (11th Cir. 1987) (en banc). Failure to notify is harmless error where all of the parties are aware of the conversion and make "all of the arguments and submit[ ] all the documents they would have presented had they received the notice...." *Denis v. Liberty Mutual Ins. Co.,* 791 F.2d 846, 850 (11th Cir.1986) (citing *Property Management & Investments, Inc. v. Lewis,* 752 F.2d 599, 605 (11th Cir.1985)).

Although this case does not precisely track the circumstances of the above cases, we think the exception applies because the portion of the policy manual upon which the court relied was submitted by the plaintiff as an exhibit to her complaint, not by the defendants. Moreover, even though Peterson is correct in asserting that Georgia law provides that a policy manual may constitute a contract for some purposes, such as benefits, even where it does not otherwise constitute a contract with respect to termination, *see Fulton–DeKalb Hospital Authority v. Metzger,* 203 Ga.App. 595, 417 S.E.2d 163, 164 (1992), the *only* thing Peterson alleges in her complaint as a breach of her contract was termination. R1–1–13. She does not allege that any other act violated some specific provision of her contract with AHA, and we will not rewrite her complaint to include such claims.

█ The law in Georgia seems fairly well settled that personnel policy manuals, outside of the constitutional context, may not create a cause of action for breach of contract through wrongful termination.[18] *See, e.g., Garmon v. Health Group of Atlanta, Inc.,* 183 Ga.App. 587, 359 S.E.2d 450, 452 (1987). We are not disposed to reverse and remand this ruling where there would be no difference in result. Therefore, we affirm the district court's dismissal of Peterson's state law breach of contract claim.

### *Order of March 3, 1992*

#### A. Property Interest

█ Some two decades ago the Supreme Court decreed that public employees may have a protectable interest in their jobs such that they may not be terminated from those jobs without the protections of procedural and substantive due process. *See Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). This in-

---

18. We recognize that this distinction may be somewhat tenuous as contract principles are applicable in determining whether a property interest exists for constitutional purposes. *See, e.g. Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1971). Moreover, to hold that the manual creates no contract for purposes of a breach of contract claim but may create a property interest for purposes of the constitutional claim raises the difficulty of circularity because her constitutional claim must have a basis in state law. However, we observe that termination cases involving constitutional claims are sui generis. They are not purely contract, nor purely employment, nor even purely constitutional cases. With respect to her breach of contract claim, we think the proper inquiry is whether her complaint would state a claim *independent* of her status as a public employee.

terest is defined as a "property interest," the dimensions of which "are defined by existing rules *or* mutually explicit understandings that stem from an independent source such as state law. . . ." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709 (emphasis added). Under Georgia law a public employee has a property interest in her job whenever she may only be dismissed for cause. *Brownlee v. Williams*, 233 Ga. 548, 212 S.E.2d 359, 362 (1975). This interest is not dependent upon the presence of the specific words "for cause," as long as whatever provisions apply "are meant to be analogous to allowing termination only 'for cause.'" *Glenn v. Newman*, 614 F.2d 467, 471–72 (5th Cir.1980).[19] The relevant inquiry is into "the expectations of the parties involved. . . ." *Id.* at 471.

■ In *Barnett v. Housing Authority of City of Atlanta*, 707 F.2d 1571 (11th Cir. 1983), this Court held that the 1977 version of AHA's policy manual created a protectable property interest in continued employment. *Id.* at 1576–77. As Peterson was an employee to which the provisions of the manual applied at the time *Barnett* was decided, it is beyond cavil that she had a property interest in her employment there of which she could not be deprived without due process. Nevertheless, AHA urges that it reserved the right in the 1977 manual to make further changes and that it revised the manual in 1986 so as to remove the language which conferred a property interest.

While we acknowledge that some Georgia precedent supports appellees' argument, we note that in those cases the reservation of right to amend was the basis on which the court held the rules at issue did not *create* a property interest. *See, e.g., Pulliam v. Georgia Firemen's Pension Fund*, 262 Ga. 411, 419 S.E.2d 918, 918–19 (1992).[20] This was also the case in *Warren* upon which the district court relied heavily.[21] In contrast, this Court has *already found* in *Barnett* that AHA's 1977 manual, in its entirety, bestowed a property interest in continued employment on its employees. Therefore, AHA is collaterally estopped from relitigating the issue of the 1977 manual.[22]

■ This is not to say that it is beyond AHA's authority to determine that employees are to be hired at will. "Vested proprietary rights may be affected, even revoked or terminated, but only in accordance with constitutional standards of due process of law." *City of Atlanta v. Mahony*, 162 Ga.App. 5, 289 S.E.2d 250, 251 (1982). As to future employees, since they have not yet acquired any rights, we agree that AHA is perfectly free to contract for their employment at will. Moreover, even as to existing employees,

---

**19.** The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981), adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**20.** The Supreme Court has also said, "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate entitlement' protected by the Due Process Clause." *Memphis Light, Gas, & Water Division v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978) (citing *Roth*). *See also Brown v. Georgia Dept. of Revenue*, 881 F.2d 1018, 1027 (11th Cir.1989) (citing *Memphis Gas*).

**21.** Moreover, in *Warren* this Court merely held that the policy manual at issue there, read *"in its entirety"* was "not intended to cover Warren's position as head of DOT." *Warren*, 927 F.2d at 563. Given that these cases will involve fairly close scrutiny of all of the applicable rules or policies at issue, the finding that a particular manual does not establish a property interest is of limited precedential value where the court is confronted with a different set of policies.

**22.** We reject appellees' argument that the reservation of right to amend merely prevented the property right at issue from "vesting." Given the holding in *Barnett*, that the policy manual conferred a property interest on the employees of which they could not be deprived without the protections of procedural and substantive due process, this argument would turn the unilateral action of the employer to revise the policy manual into the equivalent of procedural and substantive due process. A right is vested if it confers on the holder certain proprietary rights, including the right to sue for its improper deprivation. There is no question that our holding in *Barnett* found that the AHA policy manual conferred such rights. We are not inclined to render *Barnett* a nullity by adopting appellee's argument on "vesting." "This panel is bound by the decisions of prior panels of the Eleventh Circuit unless overruled by the en banc court or the Supreme Court." *Pollgreen v. Morris*, 911 F.2d 527, 534 (11th Cir.1990).

AHA may amend their employment status to at will as long as employees are given reasonable notice and an opportunity to respond and such a change can be demonstrated as in "the public interest," and "not taken as a subterfuge merely to single out and discharge particular employees." *Mahony*, 289 S.E.2d at 251. In this case, however, we hold that AHA did not give its employees meaningful notice of the change such that AHA's unilateral modifications can constitute a new "mutual understanding" concerning the employment relationship in the wake of *Barnett*.

■■■ As we have held elsewhere, "the state may not magically declare an interest to be *'non* property' after the fact for Fourteenth Amendment purposes, if, for example, a longstanding pattern of practice has established an individual's entitlement to a particular governmental benefit." *Winkler v. County of DeKalb*, 648 F.2d 411, 414 (5th Cir.1981) (quoting *Quinn v. Syracuse Neighborhood Corp.*, 613 F.2d 438, 448 (2d Cir. 1980)). In this case we hold that AHA may in fact declare employment status to be "not property," but it may not do so "after the fact" as to employees governed by the previous policy manual without clear and unmistakable notice and an opportunity to be heard.[23] Therefore, Peterson is entitled to partial summary judgment on the issue of her property interest and we reverse the district court's order with respect to all claims, under both substantive and procedural due process, and under 42 U.S.C. § 1983, which depend upon the existence of a property interest. This case is remanded with in-

structions that these claims be reinstated and Peterson be granted partial summary judgment in accordance with our holding above.

## B. First Amendment Claim

■■■ Finally, Peterson claims that she was terminated in part in retaliation for her speech concerning the pre-leasing practice and the maintenance problems at her project. The district court found, that Peterson's speech could not "be fairly characterized as constituting speech on a matter of public concern." R5–42–21 (citing *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). Under *Connick*, the court is required to review the content, form and context of the speech at issue in order to determine whether the speech involves "matters of public concern" or "matters only of personal interest." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. The rule is that this review is conducted as a matter of law. *Ferrara v. Mills*, 781 F.2d 1508, 1515 (11th Cir.1986). Nevertheless, content, form and context are factual matters,[24] although not treated as such for purposes of summary judgment. Our review of the speech at issue here convinces us that Peterson's complaints could indeed be "fairly characterized as constituting speech on a matter of public concern."

The district court found that Peterson's speech was undertaken "in her role as an employee on matters of personal concern and on matters pertaining to *internal AHA operations*." R5–42–21 (emphasis added). The court went on to note:

23. Our holding makes it unnecessary to laboriously review the numerous theories which Peterson proposes establish her property interest. Therefore, we need not decide whether the 1986 manual, viewed in isolation, establishes a property interest. Thus too, AHA's argument concerning the discretionary language in the 1986 manual is moot because we hold that the notice to employees was insufficient to divest them of their property interest.

24. As we said in *Ferrara*, this rule is in contrast to the "manner, time and place of the employee's speech [which] are factors" in the balancing test of employer's versus employee's interest laid down in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d

811 (1968). *Ferrara*, 781 F.2d at 1513. We must say, however, that any court attempting to clearly distinguish "time, place and manner" from "content, form and context," and why one is a factual inquiry and the other is not, may be engaged in task akin to the question of how many angels can dance on the head of a pin. However, "lawyers [are] trained by long practice in believing what is impossible . . . ." Felix S. Cohen, *Transcendental Nonsense and the Functional Approach*, 35 COLUM.L.REV. 809, 811 (1935). Inevitably, some of the latter will spill over into the former and vice versa. Therefore, it is entirely appropriate, as the district court did here, to review this issue only upon the presentation of evidence.

The issue of whether AHA's housing projects were being provided with maintenance staff adequate to ensure compliance with HUD requirements is clearly of concern to the public. However, Plaintiff spoke about this issue in her capacity as an employee expressing her personal concern that AHA's policies would prevent her from fulfilling her designated job responsibilities.

*Id.* at 23.

One of the difficulties with resolving this issue is that the facts in these situations may often be *fairly* interpreted in more than one way. Furthermore, those interpretations need not be mutually exclusive. For example, if an employee of a nuclear plant feels that plant controls are inadequate to protect employees from the dangers of radiation, that is a matter of both of personal interest and of public concern. That is, merely because speech has a personal component does not render it "not" of public concern. Similarly, speech need not be aired "publicly," to the media for instance, in order for it to be a matter of public concern. The employee's First Amendment rights are not lost simply because he "arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. Western Consolidated School District,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). Also, the degree of public interest in an issue, while a factor to be considered, is not dispositive of whether something is a matter of public concern. *Ferrara,* 781 F.2d at 1514.

On the other hand, with respect to public employees, there is the danger that everything that happens in a public agency could be characterized as a matter of public concern. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. There are simply no firm guidelines from which to work in determining whether speech is primarily of public concern or primarily personal.

We think that guidance may be found however in a critical word in the Supreme Court's articulation of the standard, that is the word "fairly." In *Connick* the Supreme Court did not say that an employee's speech must be "definitively" or "clearly" or "indisputably" characterized as a matter of public concern. It said if the speech in question "cannot be *fairly characterized* as constituting speech on a matter of public concern," it is unnecessary to examine the reasons for an employee's discharge. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690 (emphasis added). If it *is* capable of being *fairly* so characterized, then dismissal on summary judgment without examination of the evidence supporting the claim is inappropriate. In order to determine the "fairness" of a characterization it is relevant to examine whether the public interest is asserted on the basis of a vague and general assumption that the public would be interested, versus an articulable, specific public interest. Thus, it is not enough to assert, as in *Ferrara,* a vague and general public interest in the quality of education when challenging a teaching assignment. *Id.* at 1515–16.

In reviewing the pleadings and the record, we come to the conclusion that Shirley Peterson's speech regarding the pre-leasing practice and the maintenance problems may be fairly characterized as matters of public concern. Although some of Peterson's speech was couched in terms of her ability to do her job effectively, the thrust of her communications was not merely concern over her own effectiveness, but concern about meeting the requirements of AHA's mission as set by HUD. Furthermore, the record reflects that AHA was under rather intense scrutiny from the media regarding maintenance and crime in the projects. R4–33 Exhibit VI (newspaper articles). It also reflects that all of the defendants were under increasing pressure from HUD to comply with its maintenance guidelines. R4–33 Exhibits f, h & m (letters from HUD officials to Director of AHA). Plaintiff alleges in her complaint, (although the tape was not entered into evidence for purposes of summary judgment) that, "[o]n or about June 5, 1989, televisions crews for WAGA TV showed units in Gilbert Gardens and Carver Homes which were certified for

occupancy but were not fit for human habitation." R1–1–10. The record reflects that the public concern which the court must assess was more than a vague, general assertion about its potential interest.[25]

This is not a situation in which Peterson was attempting to require that AHA "be run as a roundtable for employee complaints." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. She was not claiming that her judgment was right, merely that the responsible persons should be informed and that the defendants conspired to suppress the communication of this information by first transferring her, and then by ensuring that she would not be rehired in the course of the reorganization.

In contrast to the district court, we do not find that such communications are purely of personal interest to Peterson or involve only "internal policies." To understand this conclusion it is useful to contrast Peterson's speech on the issues above with other complaints she alleges. Peterson claims that part of the motivation for her termination was the filing of her grievance about her transfer. Appropriately, Peterson does not rely on *this* speech for her First Amendment claim. All other things being equal, complaints about work assignments are generally matters of almost exclusively personal interest and such decisions go to *internal* operating procedures and management prerogatives to assign personnel. Thus, for First Amendment purposes, what is relevant about the transfer is not Peterson's speech about it in the form of a grievance, but whether it was undertaken in retaliation for her *earlier* speech.

In summary, we find that, construing all inferences in favor of the non-movant Peterson, as we are required to do in reviewing an order of summary judgment, Peterson's speech is capable of being fairly characterized as going to a matter of public concern. Therefore, summary judgment in favor of the defendants was inappropriate. The defendants still have the opportunity to show that this speech was either not the motivation for

Peterson's termination or that, under the *Pickering* balancing test, its interest "in promoting the efficiency of public services" justified her termination notwithstanding the legitimacy of her speech. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968).

## III. CONCLUSION

For all of the foregoing reasons, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

---

**25.** This is not to say that there must be general public awareness of a problem in order for it to constitute a matter of public concern. Some issues may be obviously of public concern from their subject matter, for instance, an alleged health or safety risk. However, particularized public interest is not irrelevant to this inquiry.